Roger O. WALTHER, Plaintiff,

v.

The BANK OF NEW YORK, Defendant.

No. 89 Civ. 2229 (MBM).

United States District Court,
S.D. New York.

Aug. 22, 1991.

Sidney Dickstein, Ira R. Mitzner and Laura A. Vikander, Dickstein Shapiro & Morin, New York City, for plaintiff.

Christine B. Cesare and Alfred W.J. Marks, Emmet, Marvin & Martin, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

James Joy and plaintiff Roger Walther each guarantied a loan made in 1986 by defendant The Bank of New York ("the Bank") to Real Estate Research Corporation ("RERC") and each secured his guaranty by pledging shares in AIFS, Inc., a publicly traded company. The security agreements that Joy and Walther each executed in connection with their respective pledges provided that the collateral would secure present as well as future obligations to the Bank. In 1987, the Bank made another loan, this one to RERC's parent, and received a guaranty from Joy, but not from Walther. Both loans are in default and the Bank intends to apply only to the 1987 loan and not to the 1986 loan the proceeds from the sale of collateral pledged by Joy, and to require that Walther honor his guaranty for the unpaid balance of the 1986 loan.

Walther has sued for a declaration that the Bank must apply to the 1986 loan the collateral pledged by Joy. The Bank has counterclaimed for judgment on Walther's guaranty of the 1986 loan as well as attorney's fees. The Bank now moves for summary judgment dismissing Walther's complaint and granting judgment on its counterclaims. For the reasons set forth below, the Bank's motion is granted.

I.

In October 1986, Walther and Joy formed a holding company, JW Holdings, Inc. (JWH), to acquire real estate appraisal and investment advisory firms. It was intended that Walther would be a passive investor while Joy actively managed the venture. (Walther Aff. ¶ 2) One of JWH's first acquisitions was RERC. By means of a term loan, dated October 28, 1986, the Bank financed the acquisition by lending RERC $1.5 million (the "1986 RERC loan").

The Bank received a corporate guaranty of the 1986 RERC loan from JWH and personal guaranties from Walther and Joy. The Bank required also that Joy pledge 124,000 shares and that Walther pledge 276,000 shares of AIFS as collateral for their respective guaranties. Joy's 124,000 AIFS shares will hereafter be referred to as "the Joy collateral." The Bank took possession of all 400,000 shares.

In connection with their pledges, Walther and Joy executed identical security agreements in which each, as "Borrower," granted the Bank a lien on all his personal property (referred to in each agreement as the "Collateral"), including the AIFS shares, "as security for all present or future obligations or liabilities of any and all

kinds ... whether incurred by Borrower as maker, endorser, drawer, acceptor, guarantor, accommodation party or otherwise...." The security agreements also authorized "the Bank in its discretion, at any time, whether or not the Collateral is deemed by it adequate, to appropriate and apply upon any of the [Borrower's obligations to the Bank], whether or not due, any [Collateral]...." Therefore, under the terms just quoted, Walther and Joy each agreed that his shares of AIFS stock would secure both present and future obligations to the Bank, and that the Bank could apply the AIFS stock to "any" obligation of the relevant obligor.

The heart of this case is Walther's claim that the Bank violated his rights as guarantor of the 1986 RERC loan by applying proceeds from the sale of the Joy collateral to a subsequent obligation. Walther's guaranty provided that:

"the undersigned unconditionally guarantees to the Bank ... the prompt payment when due of all present and future obligations ... of [RERC] to the Bank ... irrespective of the genuineness, validity, regularity or enforceability ... of any collateral [securing RERC's obligations to the Bank] or of the existence or extent of such collateral.

The undersigned hereby assents that the Bank may at any time and from time to time, ... without notice to or further consent of the undersigned, ... exchange or surrender any collateral for ... any of the Obligations [of RERC to the Bank] ..., and may also make any agreement ... with any other ... person liable on any of the Obligations, ... for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, or for any modification ... of any agreement between the Bank and ... any such other ... person, without in any way impairing or affecting this guarantee.

....

This guarantee is a guarantee of payment and not of collection, and the Bank shall be under no obligation to take any action against [RERC] or any other person liable with respect to [RERC's obligations to the Bank] or resort to any collateral security held by it to secure any of [RERC's obligations to the Bank] as a condition precedent to the undersigned being obligated to perform as agreed herein.... The undersigned hereby waives any rights to be subrogated to the rights of the Bank with respect to [RERC's obligations to the Bank] until such time as the Bank shall have received cash payment in satisfaction of all of the Obligations...."

The guaranty contained a New York choice of law clause and provided also that the guarantor would pay the Bank's reasonable expenses, including attorney's fees, associated with the "enforcement or protection" of the guaranty or any of RERC's obligations. A rider to the guaranty limited Walther's total liability to either $1.5 million or the unpaid balance of the 1986 RERC loan, whichever was less. (Kochenthal Aff., Exh. C)

Shortly before executing their respective guaranties to and security agreements with the Bank, Joy and Walther executed a "Contribution Agreement" between themselves. The Bank was not a party to that document and it refused Walther's request for specific acknowledgment or consent to the agreement. (Anderson Aff. ¶ 6) However, according to Walther, the Contribution Agreement was included on a list of documents that the Bank reviewed in connection with the closing of the 1986 RERC loan. (Mitzner Aff., Exh. 1; Anderson Aff. ¶ 6; Walther's Memorandum of Law at 6 n. 3)

The Contribution Agreement stated that it was intended "to insure that Joy will be equally liable to both the Bank and Walther should the Bank be required to call upon the guarantees issued by the Guarantors." Acknowledging that each was "jointly and severally liable" as a guarantor of the 1986 RERC loan, Joy and Walther agreed that:

"1. In the event of a call under such guarantee by the Bank, Joy agrees to be liable and responsible for 100% of the amount of such call.

2. If Walther shall have been required to pay to the Bank any amount of the Loan which was not repaid by [RERC], Walther shall be entitled to reimbursement from Joy of such amount.

3. Joy agrees to substitute additional collateral with the Bank in the event that the Bank makes any call under the guarantee which would have the effect of causing the Bank to sell or otherwise realize on the collateral pledged by Walther. The amount of such additional collateral shall have a fair market value for collateral purposes at least equal to that pledged by Walther."

(Kochenthal Aff., Exh. F)

Walther states that the Contribution Agreement "required Joy to apply his AIFS collateral ... first to satisfy the obligation to the Bank [under the 1986 RERC loan], and [also] provided that my AIFS collateral and other assets would be called upon only to the extent that Joy's assets could not satisfy the debt." (Walther Aff. ¶ 4) The Bank challenges only the relevance of the Contribution Agreement and not Walther's interpretation of it. However, it appears that the agreement says nothing about the status of the 124,000 AIFS shares which Joy initially pledged; it requires merely that Joy pledge additional shares in the event the Bank sells Walther's shares. The document embodied Joy and Walther's agreement to apportion between themselves their joint and several liability to the Bank. Although he does not claim that the Bank was bound in any way by the terms of this separate agreement, Walther does suggest that "the imprecise terms of the guarantee should be interpreted in light of the realities of the entire transaction, including the Contribution Agreement." (Plaintiff's Memorandum of Law at 36 n. 34)

In 1987, JWH needed to borrow $1.5 million to finance the acquisition of two real estate consulting firms—Zuchelli, Hunter & Associates ("ZHA") and Thompson Site Selection Research, Inc. ("Thompson"). Walther refused to guaranty this loan. However, the Bank nonetheless agreed to lend that sum to JWH on the condition that Walther temporarily guaranty a prior working capital loan to RERC. Walther agreed to provide the interim guaranty only if it would expire once JWH acquired ZHA and Thompson. The Bank agreed to Walther's condition and the loan, hereafter referred to as the "1987 JWH loan," closed on June 19, 1987.

JWH secured repayment of the $1.5 million 1987 JWH loan by pledging the stock in its three subsidiaries, RERC, ZHA and Thompson. In addition, Joy executed a personal guaranty. Walther did not guaranty the 1987 JWH loan and is not obligated in any way for its repayment. (Defendant's Rule 3(g) Statement ¶ 15) As promised, Walther's interim guaranty expired once JWH acquired ZHA and Thompson. Therefore, after the two acquisitions, there remained two guarantied obligations to the Bank: (1) the 1986 RERC loan—guarantied by Walther and Joy personally with each guaranty secured by Walther's 276,000 AIFS shares and Joy's 124,000 AIFS shares, respectively; and (2) the 1987 JWH loan—secured by the stock in JWH's subsidiaries and guarantied by Joy alone. However, because the security agreement executed at the time of the 1986 RERC loan included future obligations, Joy's second guaranty was secured by the same Joy collateral as secured his first guaranty. Moreover, "[t]o secure the liabilities of the undersigned under [the] guaranty," Joy's second guaranty itself provided the Bank with a security interest in all personal property in its possession and authorized the Bank to apply that collateral to the guaranty. (Kochenthal Aff., Exh. E) Thus, by operation of the security agreement executed in 1986 and the terms of his second guaranty, the Joy collateral secured both of Joy's guaranties.

Walther claims that when he allowed the 1987 JWH loan to go forward, he did not realize that the Joy collateral would effectively secure that loan as well as the 1986 RERC loan. In particular, he claims to have been unaware that Joy guaranteed the second loan. (Walther Aff. ¶ 9) Moreover, Walther claims also that at the time of the transaction he asked *Joy* about the "possible impact the second loan might have on

[his] guaranty of the [1986 RERC loan]" and that *Joy* had assured him that the Bank "never [made] any mention" of the AIFS stock, or "any interrelationship between the two loans." (*Id.* ¶ 8) However, Walther does not assert that there were any representations made by the *Bank* regarding the effect of the 1987 loan. He claims only that he was unaware of the Bank's "current interpretation" of the status of the Joy collateral when he allowed the 1987 loan to close. (*Id.* ¶ 10)

Both loans have been in default since March 1988. Walther claims to have learned for the first time in December 1988 that the Bank was "taking the position" that it could apply the Joy collateral to the 1987 JWH loan. (Walther Aff. ¶ 14) Since then, Walther alleges that he has tried to minimize his potential liability by arranging a transaction in which JWH could sell ZHA and Thompson for an amount that would pay partially the 1987 JWH loan, but that the Bank "resisted all good faith negotiations" for the sale of these companies. (*Id.* ¶ 16) However, except for stating that "the Bank took a passive role" when he subpoenaed RERC's former auditor for certain tax information, (*id.*), and describing the Bank's workout specialist as "extremely negative, inflexible, and unwilling to expend any effort to resolve the financial difficulties being experienced by Joy's companies," (*id.* ¶ 12), the only fact Walther provides in his affidavit to support his allegation of bad faith is that the Bank first refused his request that it demand financial statements from ZHA and Thompson, and then, when it did accede to his request, it "sent letters to the wrong parties seeking the wrong information." (*Id.* ¶ 16) In his complaint, Walther alleges that in December 1989, the Bank "refused to accommodate" the "expressed ... willingness" of the principal of Thompson to buy back the company for $2.25 million, (Complaint ¶ 31), although this allegation does not appear in his affidavit in opposition to the summary judgment motion.

Walther alleges also that even after he provided the Bank with evidence that ZHA was being mismanaged and its assets wasted, the Bank "ignored" his requests to liquidate both ZHA and Thompson. (Walther Aff. ¶ 17) In his complaint, but not his affidavit, Walther asserts that he provided the Bank with evidence that certain former officers and employees of ZHA had breached their employment agreements with the company by setting up competing businesses, but that the Bank "refused to take any action." (Complaint ¶ 32)

In January 1989, RERC was sold. ZHA and Thompson remain unsold. Walther alleges that the Bank's bad faith and negligence have prevented JWH from selling ZHA and Thompson in a timely manner and that the value of those companies has plummeted to the point where the proceeds of any sale would be insufficient to cover the 1987 JWH loan. (Walther Aff. ¶ 18) Walther claims that but for the Bank's alleged misconduct it would have been able to satisfy the entire 1987 loan by selling ZHA and Thompson and would not have had to rely on the Joy collateral.

For its part, the Bank contends that its failure to sell ZHA and Thompson is irrelevant to this action because that collateral secures only the 1987 loan. However, the Bank also challenges Walther's allegation of bad faith by contending that its effort to sell those companies has been complicated by the fact that their parent, JWH, failed to file corporate tax returns, thus making it impossible to determine the subsidiaries' income tax liability upon a sale of their stock. (Defendant's Reply Memorandum at 13–14)

Meanwhile, in May 1989, Joy declared personal bankruptcy. As a result of a settlement dated July 10, 1990 and signed by Walther, Joy and the Bank, Joy agreed to "abandon" the 124,000 shares of AIFS shares held by the Bank "in satisfaction of his obligations to the Bank" and in return for the Bank releasing him from both his guaranties. The Bank agreed also to apply $500,000 in proceeds from the sale of Joy's residence to the 1986 RERC loan. The settlement, which was approved by the bankruptcy court in August 1990, specifically provided that it would not affect Walther's guaranty of the 1986 RERC loan. (Cesare Aff., Exh. B, C)

In the fall of 1990, AIFS redeemed the Joy collateral in a transaction in which the company went private and Walther and one other person became majority owners. (Cesare Aff. ¶ 11) The Bank has placed the proceeds of this redemption in escrow pending the outcome of this suit. (Joy Aff. ¶ 28)

Walther filed his original complaint in April 1989. In November 1990, he amended his complaint to add allegations concerning the Bank's conduct with respect to ZHA and Thompson. Walther asserts nine "causes of action": breach of contract, breach of the duty of good faith and fair dealing, breach of fiduciary duty, violation of U.C.C. § 3–606, violation of U.C.C. § 9–207 with respect to the Joy collateral, violation of U.C.C. § 9–207 with respect to the ZHA and Thompson stock securing the 1987 JWH loan, "Violation of the Marshalling of Assets doctrine," "estoppel/misrepresentation," and, finally, tortious interference with the Contribution Agreement. The Bank counterclaims for the unpaid balance of the 1986 RERC loan, alleged to be $1,319,102 as of December 17, 1990, and for all expenses, including attorney's fees.

## II.

Under Fed.R.Civ.P. 56(c), a trial judge must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all reasonable inferences, against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), *cited in Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987).

The mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11–12 (2d Cir.1986). The disputed issues of fact must be "material to the outcome of the litigation," *Knight*, 804 F.2d at 11, and must be backed by evidence that would allow "a rational trier of fact to find for the nonmoving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

Summary judgment may be appropriate in contract actions where the language of the relevant agreement is unambiguous. Under New York law, which governs this dispute, if a contract is unambiguous on its face, its proper construction is a question of law. *United States Naval Institute v. Charter Communications, Inc.*, 875 F.2d 1044, 1048 (2d Cir.1989). Extrinsic evidence is inadmissible to contradict an unambiguous contract.

"Contract language is unambiguous if it has 'a definite and precise meaning unattended by the danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.' Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretation in the litigation. The court should not find the language ambiguous on the basis of the interpretation urged by one party, where that interpretation would 'strain the contract language beyond its reasonable and ordinary meaning.'

The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or

judicial views as to what terms might be preferable. In its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement. 'The parties having agreed upon their own terms and conditions, the courts cannot change them and must not permit them to be violated or disregarded.'"

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990) (*quoting Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978); *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590, 593 (1957) and *Diversified Mortgage Investors v. U.S. Life Title Ins. Co. of New York*, 544 F.2d 571, 575 (2d Cir.1976)) (citations omitted).

### III.

The issue in this case is straightforward. The Bank seeks to maximize its total recovery by (1) applying the proceeds from its sale of the Joy collateral solely to the 1987 JWH loan, and (2) forcing Walther to honor his guaranty for the full unpaid balance of the 1986 RERC loan. Walther contends that the Bank must apply the proceeds from the sale of the Joy collateral to reduce the 1986 RERC loan. As set forth below, both the clear terms of the applicable documents and New York law resolve that issue in the Bank's favor.

The language of Walther's guaranty is unambiguous. He "unconditionally guarant[ied]" the RERC loan "irrespective of the genuineness, validity, regularity or enforceability" of "any collateral therefor or of the existence or extent of such collateral." That broadly worded clause allows the Bank to collect from Walther notwithstanding its decision to apply collateral securing the guarantied loan to a different secured loan. In addition, the guaranty provided that "the Bank shall be under no obligation to take any action against [RERC] or any other person liable with respect to [RERC's obligations to the Bank] or resort to any collateral security held by it to secure any of [RERC's obligations to the Bank] as a condition precedent to the undersigned being obligated to perform as agreed herein." That clause means that the Bank has a right to collect on the guaranty whether or not it applies the Joy collateral to the 1986 RERC loan. In this case, the Joy collateral secures the 1986 RERC loan because it secured Joy's first guaranty, and it also secures the 1987 JWH loan because Joy later signed a guaranty of that loan as well.

Walther does not deny that the Joy collateral secured the 1986 RERC loan, because the whole premise of his suit is the claim that the collateral must secure that loan only. Neither does Walther dispute that his guaranty is a complete integrated written instrument which fully sets out the terms of his relationship with the Bank. Rather, he alleges that he executed the guaranty in reliance on the Contribution Agreement between himself and Joy, and Joy's pledge of the Joy collateral to secure the 1986 RERC loan. (Walther Aff. ¶ 5) However, Walther does not claim that *the Bank* made any representations regarding the future status of the Joy collateral. Therefore, to the extent Walther seeks to add to the guaranty conditions that the Joy collateral be applied solely to the 1986 RERC loan or that the Joy collateral not secure any other debts, those conditions directly contradict the "unconditional" language of the guaranty and are barred by the parol evidence rule. *See Braten v. Bankers Trust Co.*, 60 N.Y.2d 155, 468 N.Y.S.2d 861, 864, 456 N.E.2d 802, 804 (1983); *Citizens Fidelity Bank & Trust Co. v. Coulston Int'l Corp.*, 160 A.D.2d 1110, 553 N.Y.S.2d 901, 902 (3d Dep't 1990); *see also Marine Midland Bank–Southern v. Thurlow*, 53 N.Y.2d 381, 442 N.Y.S.2d 417, 418, 425 N.E.2d 805, 806 (1981) (parol evidence rule bars consideration of alleged oral agreement between maker, lender, and third party that proceeds from sale of collateral pledged by third party would be applied first to satisfy note).

Although the guaranty recognized Walther's general right of subrogation—by providing for Walther's waiver of that right until such time as the Bank is first paid in full—that recognition does not over-

come the express contractual right of the Bank to enforce its guaranty irrespective of the existence or extent of any collateral. *See Inland Credit Corp. v. Weiss*, 63 A.D.2d 640, 405 N.Y.S.2d 258, 259 (1st Dep't 1978) (principles of subrogation, "a right recognized as a matter of equity," do not override clause permitting creditor to release collateral and underlying debt without discharging guarantor).

Walther says the Bank "transferred" collateral from the 1986 RERC loan to the 1987 JWH loan. However, it is more accurate to say that the Bank "applied" collateral securing both loans in a way that maximizes its total recovery. Because that is permitted by New York law, all of Walther's objections are meritless.

■ Under the law of payment, regrettably overlooked by both sides, when a debtor has multiple debts to a creditor, some of which are guarantied, the creditor may apply the debtor's voluntary payments to those debts which are not guarantied, despite the guarantor's objection. *Smith v. Rothman*, 6 A.D.2d 859, 175 N.Y.S.2d 956, 957 (1st Dep't 1958), *aff'd*, 6 N.Y.2d 793, 188 N.Y.S.2d 187, 159 N.E.2d 679 (1959); *Wanamaker v. Powers*, 102 A.D. 485, 93 N.Y.S. 19, 21–22 (2d Dep't 1905), *aff'd*, 186 N.Y. 562, 79 N.E. 1118 (1906); N.Y.Jur.2d, *Guaranty and Suretyship* § 269 at 367 (1987). Significantly, New York has long treated proceeds from the nonjudicial sale of collateral securing more than one debt as voluntary payments which the creditor may apply in the way it sees fit. *National Bank of Newburgh v. Bigler*, 83 N.Y. 51, 64 (1880) ("If property is assigned as collateral security for several debts without direction at that time by the assignor as to the application of its proceeds, the creditor may apply the money realized to any of the notes that are due at the time the money is received."); *Commercial Trading Co. v. Freidus*, 114 A.D.2d 292, 499 N.Y.S.2d 43, 45 (1st Dep't 1986) (rejecting guarantors' objection to application of proceeds because "[p]ayment in the form of proceeds from a collateral mortgage is clearly a voluntary payment which a creditor may apply in the manner most advantageous to it.") (*citing*

*Smith, supra*); N.Y.Jur.2d, *Guaranty and Suretyship* § 269 at 368.

The New York rule allowing creditors to apply collateral securing multiple debts to the specific debts that are not guarantied is consistent with the rule of other states. *See, e.g., Ameritrust Co. v. Murray*, 20 Ohio App.3d 333, 486 N.E.2d 180, 194 (1984) (rejecting guarantor's objection to bank's application of proceeds from sale of collateral to a different loan, because security agreement executed by borrower "specifically gives [bank] the discretion to apply the proceeds from the collateral as it sees fit."); Annotation, *"Application of Payments as Between Debts for which a Surety or Guarantor is Bound and Those for which He is not,"* 57 A.L.R.2d 855, 877 (1958) ("[i]f property is assigned as collateral security for secured debts without direction at that time by the assignor as to the application of its proceeds, the creditor may generally apply the money realized to any of the debts that are due at the time the money is received....") (*citing* cases from 18 jurisdictions,—including *Bigler, supra*, from New York—and reaffirming the same rule presented in 21 A.L.R. 704, 720 (1922)).

■ Here, under the security agreement executed in October 1986, Joy unambiguously pledged the Joy collateral "as security for all present and future obligations" and granted to the Bank the right "in its discretion, at any time, ... to appropriate and apply" that collateral upon any of his liabilities. Walther can hardly claim surprise at this provision because it is identical to the language in the security agreement he executed in connection with his own pledge of AIFS stock. In addition, Joy's second guaranty itself provided the Bank with a security interest in all personal property then in its possession—such as the AIFS stock—and authorized the Bank to apply that collateral in order to satisfy the guaranty. Therefore, because the documents executed by Joy provide the Bank with absolute discretion to apply proceeds from the sale of the Joy collateral in the way it sees fit, the Bank may apply those

proceeds to the 1987 JWH loan notwithstanding Walther's objection.

None of Walther's defenses—presented as "causes of action" in his amended complaint—require the Bank to apply the Joy collateral to the 1986 RERC loan. The issue in this case is not whether Walther ever explicitly consented to the "transfer" of the Joy collateral. (Plaintiff's Memorandum of Law 23–40) Accordingly, it is unnecessary to address Walther's claim that his consent to the Bank's "exchange or surrender" of any collateral does not encompass the Bank's so-called "transfer" of the Joy collateral to the 1987 JWH loan. That characterization obfuscates the real issue in this case—whether any agreement between Walther and the Bank, or any principle of law, overrides the general rule that allows creditors to apply the proceeds of collateral securing multiple debts to those debts which are not guarantied. There is no such agreement or legal principle. Walther's defenses—his nine "causes of action"—are without merit for want of law or facts or both, for reasons that may be summarized as follows:

1. Walther first claims that the Bank's conduct breaches the guaranty. As noted, Walther "unconditionally guarant[ied]" the RERC loan "irrespective of the genuineness, validity, regularity or enforceability" of "any collateral therefor or of the existence or extent of such collateral." In the face of this unambiguous provision, Walther points to nothing in his guaranty or any other agreement with the Bank requiring it to apply the collateral to the guarantied loan. His reliance on *Depositors Trust Co. v. Hudson General Corp.*, 485 F.Supp. 1355, 1361 (E.D.N.Y.1980) is misplaced, because the guaranty in that case specifically required the bank to provide advance notice to the guarantor and to obtain the guarantor's consent before it secured subsequent loans with the same collateral that secured the guarantied loan. In this case, the guaranty contained a rider limiting Walther's total liability to the lesser of $1.5 million or the amount due under the 1986 RERC loan. This demonstrates that Walther was fully capable of protecting his potential exposure under the guaranty when he and the Bank

so agreed. However, no clause requires the Bank to provide notice or obtain consent before applying the Joy collateral to other obligations. Accordingly, the Bank's motion for summary judgment is granted dismissing Walther's first cause of action.

2. Second, Walther's claims that the Bank's application of the Joy collateral to the 1987 JWH loan breaches the implied covenant of good faith and fair dealing. Under New York law, "[a] party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of a contract for another party that it may be assumed that they are inconsistent with the intent of the parties." *See Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir.1991); *see also Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991) (every contract contains " 'an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.' ") (*quoting Grad v. Roberts*, 14 N.Y.2d 70, 75, 248 N.Y.S 2d 633, 637, 198 N.E.2d 26, 28 (1964)). "The action presumed contrary to the parties' intentions must directly violate an obligation that falls within their reasonable expectations, that is to say, the implied promise must be so much a part of the contract as to be essential to effectuate the contract's purposes." *Bank of China*, at 789.

The only relevant agreement between Walther and the Bank is the guaranty. The guaranty, by its terms, was valid irrespective of the existence of any collateral for the loan. Walther has invoked the doctrine of good faith, but has failed to present any facts suggesting that the Bank's application of the collateral, whose "existence," or lack thereof, in no way diminishes Walther's obligation under the guaranty he signed, is contrary to some implied promise of that guaranty. Unless I add terms to the guaranty that are barred by the parol evidence rule, the Bank is not preventing Walther from realizing any anticipated benefits from the guaranty contract. Under New York law, the implied

good faith doctrine does not make contractual parties fiduciaries of one another or prevent one party from realizing the benefits of separate agreements with third persons even though such realization might incidentally harm the economic interests of the other party. *See M/A–Com Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) (*per curiam*) (good faith does not "extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract.") (*quoting Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.,* 30 N.Y.2d 34, 46, 330 N.Y.S.2d 329, 334, 281 N.E.2d 142, 145, *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)).

■ By enforcing Joy's security agreement and applying the Joy collateral to the 1987 JWH loan so as to maximize its recovery on both loans, the Bank harms Walther's economic interests, but that does not prevent him from carrying out the express or implied terms of any agreement that he has with the Bank. The Bank seeks simply to enforce one agreement—the Joy security agreement—so as to maximize its recovery on the 1987 JWH loan, and to enforce another agreement—the guaranty executed by Walther—so as to maximize its recovery on the 1986 RERC loan. The implied covenant of good faith does not require a party to sacrifice its own interest, which is what Walther is trying to force the Bank to do. *See Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 15, 537 N.Y.S.2d 787, 794, 534 N.E.2d 824, 831 (1988) (implied covenant of good faith does not require party holding security interest in bank account "to do the very thing—i.e. give advance notice of its intention of segregating that account—which could well have resulted in the depletion of the account and the destruction of its security interest.").

Walther does not allege the type of misconduct which one might infer to be contrary to the reasonable expectations of parties executing a guaranty. *See Bank of China,* 937 F.2d at 789 (allegations that bank failed to exercise reasonable care with respect to letters of credit issued by

and for principal debtor, that bank acted "deliberately [to] destroy [principal debtor's] commercial viability," and that bank officer engaged in self dealing with co-guarantor created genuine issue of fact regarding bank's good faith). Although Walther makes general allegations of misconduct with respect to the Bank's failure to sell the ZHA and Thompson stock securing the 1987 loan to JWH, he makes no allegations with respect to the earlier loan—made to a separate entity—which he guarantied. With respect to RERC and the 1986 RERC loan—the only one he guarantied—Walther does not charge the Bank with any wrongful conduct that might reasonably be considered a breach of a term "so much a part of the [guaranty] contract as to be essential to effectuate" the guaranty's purpose. *Bank of China,* at 789. Accordingly, the implied covenant of good faith is not applicable, and the Bank's motion for summary judgment is granted dismissing Walther's second cause of action.

■ 3. Besides good faith, Walther cites other general principles to defend against the Bank's enforcement of the guaranty. In his third cause of action, he alleges that the Bank's application of the Joy collateral to the 1987 JWH loan breaches the Bank's "fiduciary" duty. Walther fails to answer the question that springs immediately to mind: What fiduciary duty? He fails to cite a single case, let alone a New York case, imposing any specific duty on banks to apply collateral securing more than one debt to a guarantied debt. As mentioned, New York law specifically allows creditors to apply collateral securing multiple debts to those debts which are not guarantied. *See, e.g., Freidus,* 499 N.Y.S.2d at 45. Accordingly, the Bank's motion for summary judgment must be granted dismissing Walther's third cause of action.

■ 4. In his fourth cause of action, Walther claims that the Bank's application of the Joy collateral violates § 3–606 of the Uniform Commercial Code. In relevant part that section provides that:

The holder [of a negotiable instrument] discharges any party to the instrument to the extent that without such party's

consent the holder ... (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

McKinney's 1990. I need not question how the Bank's allowable acts could "unjustifiably impair" the Joy collateral because, by its terms, the statute protects parties to a negotiable instrument only. *Bank of China*, 937 F.2d at 783. Because Walther's liability is based on a separate guaranty rather than on his endorsement of a negotiable instrument, that section is entirely inapplicable to this case. *Chemical Bank v. PIC Motors Corp.*, 87 A.D.2d 447, 452 N.Y.S.2d 41, 44 (1st Dep't 1982), *aff'd*, 58 N.Y.2d 1023, 462 N.Y.S.2d 438, 448 N.E.2d 1349 (1983). Therefore, the Bank's motion for summary judgement is granted dismissing Walther's fourth cause of action.

■ 5. Walther's fifth cause of action asserts that the Bank's application of the Joy collateral violates § 9–207(1) of the Uniform Commercial Code. That statute provides that "[a] secured party must use reasonable care in the custody and preservation of collateral in his possession." Although the section protects guarantors, *FDIC v. Frank L. Marino Corp.*, 74 A.D.2d 620, 425 N.Y.S.2d 34, 36 (2d Dep't 1980), there is no authority interpreting it in a way that might defeat the Bank's general right to apply collateral securing multiple debts to debts that are not guarantied. *Freidus*, 499 N.Y.S.2d at 43. The challenged act is not the Bank's failure to use reasonable care. Rather, the challenged act is the Bank's decision to apply the Joy collateral in the manner most beneficial to it, as allowed by the applicable documents. Walther fails to explain how that conduct is forbidden by § 9–207. Accordingly, the Bank's motion for summary judgement is granted dismissing Walther's fifth cause of action.

6. In his sixth cause of action, Walther claims that the Bank violated § 9–207 by negligently handling the stock of ZHA and Thompson securing the 1987 JWH loan. He alleges that the Bank failed to negotiate in good faith with parties interested in purchasing the stock, that it acted negligently in furnishing financial statements to potential bidders, and that it allowed the companies to plummet in value by failing to prevent mismanagement and waste. Walther claims that the Bank's conduct contributed to the fact that ZHA and Thompson are currently worth only $550,-000, compared to $1.6 million in March 1989 and $6 million when JWH purchased them in June 1987. (Walther Aff. ¶¶ 15–18) He asserts that the Bank's conduct injured him because if the Bank had acted diligently, those assets could have satisfied the 1987 JWH loan without need to resort to the Joy collateral.

■ As mentioned in connection with Walther's fifth cause of action, § 9–207(1) of the Uniform Commercial Code provides that "[a] secured party must use reasonable care in the custody and preservation of collateral in his possession." In turn, § 9–207(3) provides a right of action for violation of that statute by providing that a "secured party is liable for any loss caused by his failure to meet any obligations imposed by the preceding subsections." That statute provides a guarantor pledging his own collateral with a right of action against a "secured party" who failed to honor his request to sell that collateral before its value dropped. *Frank L. Marino Corp.*, 425 N.Y.S.2d at 36; *but cf. American Bank & Trust Company v. Lichtenstein*, 48 A.D.2d 790, 369 N.Y.S.2d 155, 158 (1st Dep't 1975) (*per curiam*) (bank not liable for failing to sell stocks and bonds and allowing it to decrease in value; court noted also ("[a]nd indeed") that debtor never requested such a sale). The issue is whether § 9–207(3) applies to a creditor's handling of collateral that secures a loan on which the guarantor is not liable.

■ Although there might be a cause and effect relationship between the Bank's handling of the ZHA and Thompson stock and Walther's liability under his guaranty, Walther cites no authority upholding a right of action in favor of a party damaged only indirectly by a secured lender's conduct. Walther conjectures that if the Bank

had not mismanaged the collateral securing the 1987 JWH loan, that collateral would not have declined in value and the Bank could have sold it to a ready, willing and able buyer for a price that would have partially or fully satisfied the loan and enabled the Bank to apply the Joy collateral to the 1986 RERC loan. Under Walther's logic, any party could sue the Bank for negligence with respect to the collateral, including families of Thompson's and ZHA's employees who might claim damages caused by the Bank's alleged failure to prevent mismanagement at the companies. The law does not scatter liability that far. *Cf. Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 344–45, 162 N.E. 99 (1928) (Cardozo, C.J.).

In any case, Walther has no rights under § 9–207(3) because the statute provides a right of action to "debtors" only with respect to the specific debt secured. Although the Uniform Commercial Code's definition of "secured party"—"lender, seller or other person in whose favor there is a security interest" (§ 9–105(m))—does not directly address who may sue such a "secured party" under § 9–207(3), subsection (2) of the statute qualifies the secured party's general duty set forth in subsection (1) by allocating certain specified risks between the "secured party" and the "debtor." For example, § 9–207(2)(a) provides that "[u]nless otherwise agreed, when collateral is in the secured party's possession ... the risk of accidental loss or damage is on the debtor to the extent of any deficiency in any effective insurance coverage." This strongly suggests that only "debtors" possess a right of action under § 9–207(3).

Section 9–105(d) defines "debtor" as "the person who owes payment or other performance of the *obligation secured.*" (emphasis added). Although "debtor" has been interpreted to include guarantors, *see Marine Midland Bank v. CMR Industries, Inc.*, 159 A.D.2d 94, 559 N.Y.S.2d 892, 900 (2d Dep't 1990); *Marine Midland Bank, N.A. v. Kristin Int'l Ltd.*, 141 A.D.2d 259, 534 N.Y.S.2d 612, 614–15 (4th Dep't 1988), it does not include persons who are not liable for the particular "obligation secured"—in this case, the 1987 JWH loan.

*See MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 620 (2d Cir.1989) (subsidiary of company that pledged collateral to lender not a "debtor" under U.C.C. § 9–507, which provides debtors with a right of action against secured parties for failing to dispose of collateral in a commercially reasonable manner). Walther's obligation to the Bank under his guaranty of the 1986 loan to RERC is wholly separate and independent from the 1987 loan to JWH secured by ZHA and Thompson. Walther is not a "debtor" with respect to the 1987 loan. Therefore, he may not use § 9–207(3) to challenge the Bank's conduct with respect to the collateral securing the 1987 loan.

In a similar case, Judge Conner has held that the makers of several promissory notes could not assert, as a defense to a holder's action on the notes, the holder's failure to dispose in timely fashion of collateral that corporations controlled by the makers had pledged as security because the makers themselves had no rights in that collateral by way of subrogation or contribution. *American Express Int'l Banking Corp. v. Sabet*, 512 F.Supp. 463, 469–70 (S.D.N.Y.1980). Here, Walther has no rights in the relevant collateral by subrogation, contribution or otherwise. Moreover, the relationship between Walther and the ZHA and Thompson stock is even more attenuated than the relationship between the makers and the collateral in the case before Judge Conner because the collateral here does not even secure the debt for which Walther is liable. The Bank's motion for summary judgment is granted dismissing Walther's sixth cause of action.

7. Walther's seventh cause of action claims that the Bank's application of the Joy collateral to the 1987 JWH loan violates the marshalling-of-assets doctrine. Marshalling is an equitable doctrine requiring a senior creditor, having two funds available to satisfy a single debt, to resort first to the fund that is not available to a junior creditor of the same debtor in order to avoid the inequity which would result from the senior creditor's election to proceed against the only fund available to the

junior creditor, thereby preventing the junior creditor from obtaining any satisfaction of its debt. *In re Central R. Co.*, 45 B.R. 1011, 1020 (D.N.J.1985). "Its purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237, 84 S.Ct. 318, 321, 11 L.Ed.2d 293 (1963). "Marshalling has three elements: 1) two or more creditors of the same debtor; 2) multiple funds belonging to that debtor; and 3) one creditor having the ability to resort to all of the funds." *In re Craner*, 110 B.R. 111, 122 (Bankr. N.D.N.Y.), *rev'd in part on other grounds*, 110 B.R. 124 (N.D.N.Y.1989).

However, that doctrine does not override a creditor's general right to apply collateral securing multiple debts to those that are not guarantied. The party who seeks marshalling must demonstrate that the rights of other creditors, including the senior creditor, will not be prejudiced. *Meyer*, 375 U.S. at 238, 84 S.Ct. at 321; *In re Tampa Chain Co.*, 53 B.R. 772, 777 (Bankr.S.D.N.Y.1985); *In re Leonardo*, 11 B.R. 453, 454 (Bankr.W.D.N.Y.1981). Passing the issue of whether Walther has standing to invoke the doctrine without showing that he has a current security interest in the Joy collateral, *see Craner*, 110 B.R. at 123 ("unsecured creditor may not avail himself of doctrine of marshalling assets as it is basically a protection for junior secured creditors"), marshalling is not applicable to the facts of this case because there is only one fund available to satisfy Joy's obligations to the Bank—the Joy collateral. This is not a case where both Walther's and the Bank's claims against Joy, the common debtor, could be fully satisfied by forcing the Bank to proceed against one of the debtor's several available funds. Rather, both Walther and the Bank seek to benefit from the same fund because it is the only asset available to satisfy Joy's obligations to each. Because the marshalling doctrine is not relevant to the facts of this case, the Bank's motion for summary judgement is granted dismissing Walther's seventh cause of action.

8. Through his eighth cause of action, Walther would equitably estop the Bank from applying the Joy collateral to the 1987 JWH loan. He contends that if the Bank had "revealed" its interpretation of the relevant documents in June 1987, he would not have guarantied the RERC working capital loan, and the second transaction never would have occurred. (Walther Aff. ¶ 10) As mentioned, the Bank agreed to the 1987 JWH loan on condition that Walther provide an interim guaranty of the working capital loan. By its terms, that guaranty expired once JWH completed its acquisition of ZHA and Thompson.

Walther does not accuse the Bank of misrepresenting the effect of the 1987 JWH loan. He asserts only that "Joy assured me that in his conversations with the Bank, there was never any mention of our AIFS stock pledged on the October 1986 loan, or any interrelationship between the two loans...." *Id.* at ¶ 8. For his part, Joy asserts, "to the best of [his] recollection," that when he negotiated the 1987 JWH loan:

"the Bank never mentioned the lack of 'independent' collateral, i.e., security other than the stock of ZHA and Thompson, on the second loan. In my numerous discussions with [Bank officers], I do not recall any reference at all to the first loan or the AIFS stock pledged to secure that loan. It was my understanding that even though I was to personally guarantee the second loan, the Bank treated the two loans as separate and independent transactions.

. . . .

I do not recall Bank representatives ever discussing the possibility or intent of transferring my stock from the first (October 1986) loan and using it as security for the second loan.

At no time during my extensive discussions with several Bank representatives about the structure of the June 1987 loan and its security, either prior to or within a year after the execution of the second loan, did any representative of the Bank take the position that the Bank had the

ability to transfer my AIFS stock from the October 1986 loan, where I had pledged it, to the second loan."
(Joy Aff. ¶¶ 19, 21–22)

The lawyer Walther employed to negotiate his interim guaranty of the working capital loan asserts also that "at no time during my discussion with [a Bank officer] regarding the interim guarantee did she or any other representative of the Bank take the position that the Bank had the ability to transfer Joy's AIFS stock from the 1986 loan to the 1987 loan or disclose to me that it was the Bank's position that it could legally do so." (Anderson Aff. ¶ 9) Both the lawyer and Joy assert further that a memorandum which JWH distributed in connection with its private placement of JWH stock at the time of the 1987 loan never mentioned that the loan was secured indirectly by the Joy collateral, and that the Bank reviewed this document and was therefore aware of its contents when it made the loan. (*Id.* at ¶ 10; Joy Aff. ¶ 23) The private placement memorandum did recite, however, that the loan "*will* be guaranteed by Mr. Joy in his individual capacity, and *will* be secured by the pledge to the Bank of all of the issued and outstanding stock of" ZHA and Thompson. (Mitzner Aff., Exh. 2 at p. 65) (emphasis added) This document was issued by the very company in which Walther was a named principal (the "W" in "JW Holdings, Inc.") and was written prior to the closing date of the 1987 RERC loan.[1] This fact flatly disproves Walther's sworn assertion that at the time he "permitted the second loan to go through. I did not know ... how the second loan was collateralized, and I was not aware that Joy gave the Bank a personal guarantee in connection with the June 1987 loan." (Walther Aff. ¶ 9) It is inconceivable that Walther did not read the private placement memorandum issued by his own company if he was as concerned in 1987 about his potential exposure under the second loan as he now claims. At the very least, Walther's attorneys or JWH's attor-

neys must have read the document; they wrote it. In his brief opposing the Bank's summary judgment motion, Walther repeats the claim that at the time he gave his consent to the second loan, he was unaware that Joy would provide a personal guaranty. (Walther's Memorandum of Law at 9) Passing such enticing issues as whether Walther knew of, or merely neglected to recognize, the conflict between his affirmation and the documentary evidence when he signed his affidavit, or whether Walther's statement amounts to perjury or warrants Rule 11 sanctions, at the very least the private placement memorandum refutes decisively any claim that the Bank tried to conceal Joy's guaranty from Walther—a claim for which Walther has presented no factual support.

The doctrine of equitable estoppel "is imposed by law in the interests of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct has been misled into acting upon the belief that such enforcement would not be sought." *Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663, 667, 436 N.E.2d 1265, 1269 (1982). The facts Walther presents do not measure up to that doctrine.

Walther alleges no conduct that could have caused him reasonably to believe that the Bank would not assert its right to apply the Joy collateral to the 1987 RERC loan. There is no evidence that the Bank made any misrepresentations to any party or that it attempted to conceal any essential fact from Walther in a way that misled him. In short, there is no evidence that any "misleading" words or conduct of the Bank caused Walther to guaranty the interim RERC working capital loan. Moreover, even if the Bank's silence had somehow "misled" Walther into not realizing the full consequences of the 1987 transaction, any

---

1. The copy of the private placement memorandum that Walther submits as part of his evidence in opposition to the Bank's summary judgment motion has a date of June 8, 1987, and is "as amended June 18, 1987"—the day before the 1987 JWH loan closed. (*See* Mitzner Aff., Exh. 2 (cover page))

reliance on that silence would not be "justifiable," because the security agreement executed by Joy in 1986, which plainly applied to subsequent obligations, is identical to the one Walther himself executed at the same time in connection with his own pledge. *See Baron v. Lombard,* 71 A.D.2d 823, 419 N.Y.S.2d 388, 389 (4th Dep't 1979) (estoppel requires conduct that causes belief which is "reasonable under the circumstances of the case"), *aff'd,* 50 N.Y.2d 896, 430 N.Y.S.2d 591, 408 N.E.2d 920 (1980). Walther had no basis for believing that Joy's security agreement was different from his own, much less a basis arising from anything the Bank did or said. Accordingly, because Walther fails to present any facts that suggest grounds for an estoppel, the Bank's motion for summary judgment is granted dismissing Walther's eighth cause of action.

9. Walther's ninth cause of action alleges that the Bank tortiously interfered with the Contribution Agreement which he and Joy executed in October 1986. As mentioned, Joy and Walther executed that agreement in order to apportion between themselves their joint and several obligations to the Bank as guarantors of the 1986 RERC loan. The agreement provided that Joy would reimburse Walther if Walther was required to honor his guaranty and that Joy would pledge additional collateral to the Bank if the Bank sought to sell Walther's AIFS stock. Although the Bank knew of the agreement, it refused to specifically acknowledge or consent to it. (Anderson Aff. ¶ 6)

Under New York law, to recover for tortious interference with a contract, a plaintiff must prove that there exists a valid contract between the plaintiff and a third party, that the defendant knew of that contract's existence, and that the defendant intentionally and improperly interfered with the performance of that contract. *Enercomp, Inc. v. McCorhill Pub., Inc.,* 873 F.2d 536, 541 (2d Cir.1989); *Ecolab, Inc. v. Paolo,* 753 F.Supp. 1100, 1113 (E.D.N.Y.1991); *S & S Hotel Ventures Limited Partnership v. 777 S.H. Corp.,* 108 A.D.2d 351, 354, 489 N.Y.S.2d 478, 480 (1st Dep't 1985). A party intentionally and improperly interferes with a contract when he " 'induc[es] or otherwise caus[es] a third person not to perform' his contractual obligations to plaintiff." *Id.* (*quoting Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 189, 428 N.Y.S.2d 628, 631, 406 N.E.2d 445, 448 (1980)).

By that standard, Walther's claim fails. Walther presents no facts demonstrating that the Bank induced or otherwise improperly caused Joy to not perform his duties under the Contribution Agreement. By seeking to apply the Joy collateral to the 1987 JWH loan, the Bank seeks merely to enforce its own separate agreement with Joy. There is nothing wrongful or improper about such conduct. "Implicit in [tortious interference with contractual relations] is the notion of some wrongful or improper conduct." *Enercomp,* 873 F.2d at 542. Walther is unable to enforce the Contribution Agreement because Joy is now bankrupt, not because of anything the Bank did with respect to that contract. The Bank's only interest is to have both loans repaid; it has no interest in how Joy and Walther chose to work out between themselves their joint and several obligations under the 1986 RERC loan. If Joy is now unable to perform his duties under the Contribution Agreement, that was a risk Walther assumed when he entered into a joint guaranty with Joy of the 1986 RERC loan. Because Walther fails to create a genuine issue of fact suggesting tortious interference with contract, the Bank's motion for summary judgment is granted dismissing Walther's ninth cause of action.

## IV.

For the reasons set forth above, the Bank's motion for summary judgment dismissing Walther's amended complaint and granting judgment on its first counterclaim is granted. The Bank's motion for summary judgment is also granted on its second counterclaim for costs and attorney's fees incurred in connection with this action. The guaranty unambiguously provides that Walther must "pay on demand, all expenses ... including reasonable expenses

for legal services of every kind ... in any way relating to the enforcement or protection of the rights of the Bank hereunder...." Walther's only defenses to paying those expenses are his purported defenses to the guaranty. Because those defenses fail as to the guaranty, they fail also as to the demand for costs and fees, and the Bank is entitled to summary judgment on that claim as well.

The parties are directed to confer in an attempt to agree upon the amount and form of a judgment. Absent such agreement, the Bank will submit a proposed judgment, accompanied by proof of costs and fees based on contemporaneous time records, on or before September 20, 1991. Plaintiff may file objections and any counter proposed judgment on or before October 1, 1991.

SO ORDERED.