Salvatore R. **CURIALE**, Superintendent of Insurance, State of New York Insurance Department, in His Capacity as Liquidator, Plaintiff,

v.

Thomas N. **CAPOLINO**, Joseph R. Cortapasso, Advantage Security Control Systems Incorporated, Advantage Security & Protection Corporation, and T.N. Capolino Trucking Corp., Defendants.

No. 89 Civ. 4585 (LAK).

United States District Court,
S.D. New York.

March 31, 1995.

William O. Purcell, Peter Cal, Kirkpatrick & Lockhart, New York City, for plaintiff.

Joseph R. Cortapasso, pro se defendant.

## OPINION

KAPLAN, District Judge.

This is an action by the Superintendent of Insurance of the State of New York pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), and various state law theories. The Superintendent claims that Thomas N. Capolino bribed key employees of the Liquidation Bureau of the New York State Department of Insurance. The object of the scheme was to secure contracts for entities owned by Capolino, or in which he held interests, to supply the Bureau with various goods, services and real estate. According to the Superintendent, Capolino entities were paid for some goods and services that were unnecessary or that were not provided, and all of the purchases were overpriced. The Superintendent seeks to recover treble damages and attorneys' fees, plus interest.

The action was commenced against Capolino, three companies allegedly owned or con-

trolled by him—Advantage Security Control Systems Inc. ("Advantage Security"), Advantage Security & Protection Corp. ("Advantage Protection") and T.N. Capolino Trucking Corp. ("TNC")—and Joseph R. Cortapasso. Advantage Security and Advantage Protection filed petitions for protection under the Bankruptcy Code prior to trial, so the action has been stayed as against them. On the first day of the trial, Capolino and TNC announced that they would not defend the action and consented to the entry of a default judgment against them. That left Mr. Cortapasso as the only defendant. Cortapasso and the Superintendent then waived trial by jury and the action was tried to the Court. These constitute the Court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52.

## FACTS

### The Liquidation Bureau

Under New York law, the Superintendent is the sole individual eligible to be appointed receiver of insolvent insurance companies domiciled in the State. In consequence, the Superintendent routinely is appointed by the New York courts as receiver of insolvent domestic insurers, some of which are rehabilitated and others liquidated.

The Liquidation Bureau is the arm of the Insurance Department that assists the Superintendent in carrying out his duties as receiver. The Bureau is headed by a Special Deputy Superintendent in Charge, who is appointed by the Superintendent. It contains four departments: Administrative Services, Claims, Finance, and Legal. The Department of Administrative Services is headed by a Director, who reports to the Special Deputy in Charge. It is responsible for, among other things, purchasing goods and services and leasing real estate on behalf of the Bureau.

Defendant Cortapasso was the Director of Administrative Services from October 1980 until September 21, 1987 when he retired. (PTO B–8)[1] Cortapasso, however, was told to

go on vacation in July 1987, when suspected irregularities that led to this suit came to light. In consequence, he ceased functioning as Director of Administrative Services in July 1987. At all relevant times, John DePrima was Cortapasso's assistant. (PTO B–21)

### The Bureau's Dealings with Capolino

Beginning as early as 1984, Capolino companies, including but not limited to those named as defendants here, became favored suppliers to the Bureau. The Bureau entered into at least the following transactions with Capolino companies:

1. It leased warehouse premises in Brooklyn known as the Kenston space from a Capolino company.

2. It leased warehouse space in Queens known as the Rodless space from another Capolino company.

3. It leased space at 123 William Street in Manhattan in a transaction in which Capolino's attorney was designated co-broker for the Superintendent and received a commission of approximately $690,000, the bulk of which went to Capolino.

4. It purchased a "cardkey" access control and time and attendance system for its offices at 123 William Street.

5. It purchased alarm systems for the Kenston space from Advantage Security.

6. It purchased trucking services from TNC.

7. It purchased security guard services from Advantage Protection.

8. It purchased cleaning services from various Capolino entities.

Except as indicated below, all of these transactions, or payments for them, were authorized or recommended by Cortapasso. In many cases, the prices paid were substantially in excess of fair market value. Cortapasso approved or recommended these purchases without securing *bona fide* competitive bids which, in almost all cases, directly violated competitive bidding regulations of

---

1. "PTO" refers to the Joint Pre-trial Order. "B–8" refers to paragraph 8 of section B, which contains the undisputed facts.

the Bureau of which Cortapasso was aware and which, with respect to the later part of the relevant period, he had a role in promulgating. The evidence established, moreover, that on a few occasions Capolino entities with dissimilar names submitted what appeared on their face to be competing proposals for the same work without disclosing that all of the entities submitting proposals were controlled by Capolino. In each case these were addressed to Cortapasso, and the inference that these were prepared in an effort to create a fictitious record of at least partial compliance with the bidding regulations is inescapable.

*Cortapasso's Culpability*

Cortapasso admitted that he knowingly ignored the bidding regulations and steered work of all sorts to Capolino's companies. He testified that the bidding regulations were promulgated because State auditors wanted such regulations in place, but that he rarely paid any attention to them. He added that none of his superiors ever told him that he was supposed to follow the regulations though, of course, the regulations on their face state that they are mandatory absent a waiver by the Special Deputy in Charge. Waivers were permitted in emergency situations but never sought in any of these transactions.

Cortapasso freely acknowledged as well that he developed a close personal relationship with Capolino, which included shared lunches and vacations as well as gambling excursions to Atlantic City. At one point, Cortapasso's son worked for Capolino. Cortapasso stated, however, that he gave the work to Capolino companies because Capolino constantly importuned him to do so, because the jobs were done by Capolino's companies without any difficulty, and because Capolino's prices were reasonable. Cortapasso admitted that his actions probably made his job easier in the sense that Capolino offered one-stop shopping for a large spectrum of the Bureau's needs, thus saving Cortapasso the labor of going through the less convenient procedures required by the competitive bidding regulations. But Cortapasso denied any improper motive. The Superintendent asserts that Capolino's favored

status was the product of garden variety corruption including payoffs and kickbacks to Cortapasso. The case, while circumstantial, is extensive and formidable.

Perhaps the most direct evidence of kickbacks to Cortapasso relates to the Superintendent's lease of the William Street premises in 1985.

In late 1984, the Liquidation Bureau was considering either renewal of the lease for its space at 116 John Street or the procurement of new premises. (PX 180) Cortapasso was involved in the search. On April 12, 1985 he received a proposal from Cushman & Wakefield ("C & W"), the owner's broker, with respect to 123 William Street. Two weeks later, C & W wrote to the Special Deputy in Charge of the Bureau, enclosing a survey of possible rental locations and noting copies to both Cortapasso and Max Markus Katz, who was Capolino's lawyer. (PX 186) On July 3, 1985, following a tour of 123 William Street with Cortapasso, C & W wrote to *Katz*, who had no relationship to the Bureau other than the connection through Capolino and Cortapasso, to convey the owner's offer of the William Street space. (PX 187) Two days later, Cortapasso passed the offer that C & W had sent to Katz on to the Special Deputy. (PX 187) In due course, the Superintendent leased the space.

Somehow Katz became the Superintendent's broker on the William Street transaction and thus received a commission of $692,-988.87, paid in three equal, annual installments. (PX 195) This nominally was split among Katz, Capolino, two Capolino companies, and another Capolino associate named Rennert. (PX 192) Notes relating to the division of the commission—written in Capolino's handwriting on a copy of Katz's commission invoice—state "108,250.00 3X to Joe C." (PX 195; PTO B–61) It is undisputed that Capolino sometimes referred to Cortapasso as Joe C. (PTO B–68)

Cortapasso claimed at trial that he was unable to recall if he knew Katz at the time of these events or to explain how Katz became involved in the transaction. He acknowledged, however, that he "might have" told Capolino that the Bureau was looking for space. In contrast, Capolino admitted

that he had recommended the involvement of Katz and Rennert to Cortapasso in connection with the Bureau's search for space. (PX 416 at 726–29) There is no other rational explanation on this record for Katz's involvement. We therefore find that Katz became involved as a result of Cortapasso's efforts on Capolino's behalf and that Capolino's notes on Katz's invoice indicate that part of the brokerage commission received by Capolino and Katz was kicked back to Cortapasso. But there is more.

During the period in question Cortapasso was employed at a salary of about $60,000 a year, reaching a peak just prior to retirement of $69,010. His wife earned about another $15,000, and the couple had no other regular source of income. Cortapasso, however, was a gambler who visited Atlantic City with some frequency. Casino records offered by the Superintendent demonstrate that he made cash deposits to a casino cage account at Trop World in August and September 1986 totalling $10,000. In 1986, he purchased two automobiles in connection with which he paid cash deposits. In 1987, he purchased a boat at a cost of more than $27,000, paying over $12,000 in cash. There were also three unexplained cash deposits totalling $10,900 to Cortapasso's bank account over the period April 1984 through his departure from the Bureau and a documented $1,690 cash gambling loss.

Cortapasso sought at trial to explain some, although not all, of this cash flow. He asserted that his wife received $20,000 in insurance proceeds on the death of their daughter and, on one occasion, withdrew $5,800 in cash from her account and gave the money to Cortapasso, who immediately deposited it in his account. He said that $7,000 of the $12,-000 that he put down in cash on the boat came from his son. He testified also that he generated $24,000 in cash at some point between 1983 and 1986 by refinancing his house and kept the cash in his house. No docu-

mentary evidence was offered at trial to corroborate any of this testimony.[2] Neither Mrs. Cortapasso nor the Cortapassos' son testified.

Another piece of the Superintendent's web of circumstantial evidence concerns Capolino. The Superintendent offered extensive records of bank accounts of Capolino and certain of his companies as well as the testimony of the manager of a Citibank branch at which Capolino banked during the relevant period. The evidence demonstrated that Capolino frequently cashed large checks, thereby generating at least $369,000 in cash during the period relevant here. While the cash that passed through Cortapasso's hands, as far as the direct proof shows, was small in relation to the cash generated by Capolino, the dates of some of the Cortapasso cash transactions are in sufficiently close proximity to transactions in which Capolino generated cash to permit the inference that at least some significant amount of cash passed from Capolino to Cortapasso. For example, on March 26, 1987, Capolino cashed a check for $9,900 (PX 203) and Cortapasso made a $6,500 cash deposit to his account (PX 167). On July 17, 1987, Capolino cashed a check for $4,360 (PX 203), while Cortapasso deposited $5,000 in cash on the following day. (PX 235)

Nor is this all. The record contains evidence that Cortapasso approved payments to Capolino entities for work allegedly done for the Bureau pursuant to invoices dated so soon after the purported proposals by the ostensible vendors as to indicate that Cortapasso either (a) approved payment prior to the work being done or (b) papered the file to create the appearance that the work was properly awarded to the vendor when, in reality, Cortapasso simply steered it to Capolino. We find also that Cortapasso knowingly was involved in Capolino's efforts to create the appearance of competitive bidding for Bureau jobs, as the probable explanation for

---

2. After trial, Cortapasso submitted to the Court copies of various financial documents, presumably in an effort to explain his cash flow. Although he did not make a motion to re-open the trial record, we treat it as such and we find that the standard to reopen the record has not been met. *See, e.g., John v. Sotheby's, Inc.,* 858 F.Supp. 1283, 1288 (S.D.N.Y.1994). Even if the standard had been met, we find that the submissions do not shed sufficient light on Cortapasso's unexplained cash flow to warrant a different result in this case. They establish, at most, that $6,000 was withdrawn in July 1986 from a custodial account for benefit of Cortapasso's daughter and that the Cortapassos received $25,371 from a refinancing in September 1983.

Capolino's having done so is concern by Cortapasso that his disregard of the competitive bidding regulations would be discovered.

While there is considerably more evidence bearing on Cortapasso's culpability, it is unnecessary that we detail all of it. It suffices for present purposes to find, as we do, that beginning no later than April 3, 1984,[3] Cortapasso was a knowing party to a scheme involving Capolino and others pursuant to which Cortapasso took bribes and accepted other things of value from Capolino in exchange for taking action on behalf of the Liquidation Bureau favorable to Capolino, including disregard of the competitive bidding regulations, involvement of Katz in the 123 William Street lease, and other activities detailed below with regard to the computation of damages. It remains therefore to consider the legal theories on which Cortapasso is liable and exactly what damages the Bureau sustained.

*Bases of Liability*

██ *1. Substantive RICO Claim.* The Superintendent contends that Cortapasso is liable under 18 U.S.C. §§ 1962(c) and 1962(d) for substantive violation of and conspiracy to violate the RICO Act.

The elements of a Section 1962(c) violation are:

"(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly ... participates in (6) an 'enterprise' (7) the activities of which affect interstate commerce." *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025 [104 S.Ct. 1280, 79 L.Ed.2d 684] (1984).

All of these elements are satisfied here.

Cortapasso manifestly committed two or more acts of racketeering activity. Numerous mailings were made pursuant to the scheme and, as all or substantially all were reasonably foreseeable to Cortapasso, each constituted a separate act of racketeering activity.[4] The pattern requirement is satisfied because the acts were related to each other, took place over a period of more than three years, and would have continued had Cortapasso not been found out. *See H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Metromedia Co. v. Fugazy,* 983 F.2d 350 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).

The satisfaction of the enterprise-related elements is not as obvious. The plaintiff alleges the existence of two enterprises: associations in fact consisting of (1) Advantage Security, Advantage Protection, TNC, and a number of other Capolino entities, and (2) the other Capolino entities, standing alone. (PTO D–7 through D–8) Assuming *arguendo* that the plaintiff proved that these "entities," which in some cases seemed to be little more than names of convenience employed by Capolino, constituted enterprises, there are significant doubts as to whether Cortapasso conducted or participated in the conduct of the affairs of these enterprises— which were controlled by Capolino—within the meaning of *Reves v. Ernst & Young,* —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), in view of the lack of proof that Cortapasso had some part in directing their affairs. *See United States v. Viola,* 35 F.3d 37, 40 (2d Cir.1994). But we need not resolve this issue.

Plaintiff, aware of the Court's reservations on this point, has moved pursuant to FED. R.CIV.P. 15(b) to amend the pleadings to conform to the proof that the Liquidation Bureau was among the alleged enterprises. In view of the fact that the claims, defenses and evidence in the trial of the action against Cortapasso would have been identical if plaintiff had relied from the outset on the Bureau as the enterprise, Cortapasso would not be prejudiced in any relevant sense and we therefore grant the motion.

There no longer is any doubt that a governmental unit such as the Liquidation Bureau is an "enterprise" within the meaning of RICO. *E.g., United States v. Angelilli,* 660

---

**3.** This is the date of the first substantial, unexplained cash deposit to Cortapasso's account.

**4.** The invoices and other documents by which Capolino sought payment and the Bureau's checks typically were mailed.

F.2d 23, 30–35 (2d Cir.1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982); ARTHUR F. MATTHEWS, ET AL., CIVIL RICO LITIGATION § 5.03, at 5–15 & n. 26 (1991). Nor is there any serious doubt that Cortapasso, as Director of Administrative Services of the Bureau, conducted or participated in the conduct of the affairs of the Bureau through the pattern of racketeering activity demonstrated here. Finally, the Liquidation Bureau, in assisting the Superintendent in his role as receiver of insolvent insurance companies domiciled in this State, affects interstate commerce. In consequence, Cortapasso is liable under Section 1962(c).

■ *2. RICO Conspiracy.* A conspiracy to violate RICO includes an agreement to conduct the affairs of an enterprise, the activities of which affect interstate or foreign commerce, through a pattern of racketeering activity. In this Circuit, each alleged conspirator must have agreed to commit at least two acts of racketeering activity. *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21 (2d Cir.1990); *United States v. Ruggiero,* 726 F.2d 913 (2d Cir.), *cert. denied,* 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984).

■ These elements are satisfied here, largely for the reasons set forth above. We note only that each mailing foreseeably made in furtherance of a corrupt scheme constitutes a separately indictable violation of the mail fraud statute, and thus a separate act of racketeering activity, irrespective of whether the defendant personally uses the mails. *E.g., Spira v. Nick,* 876 F.Supp. 553, 560 (S.D.N.Y.1995). Hence, by his knowing adherence to the scheme pursuant to which Cortapasso furthered Capolino's interests at the Bureau in exchange for bribes and other consideration, a scheme which foreseeably involved numerous uses of the mails to transmit invoices to the Bureau and checks to Capolino and his entities, Cortapasso conspired to violate RICO in violation of 18 U.S.C. § 1962(d).

■ *3. State Law Claims.* The Superintendent asserts claims under State law on theories of common law fraud, breach of fiduciary duty, and commercial bribery. We need consider only the breach of fiduciary duty claim, and that only briefly.[5] Cortapasso's actions in accepting bribes to influence his official action and his willful disregard of the competitive bidding regulations obviously breached the duty of loyalty he owed to his employer.

## Compensatory Damages

We come, then, to the issue of compensatory damages.

■ *1. 123 William Street commission.* The landlord paid a brokerage commission of $692,739 to Capolino and his associates by virtue of Cortapasso's improper action in involving them as a broker for the Superintendent in the rental of this space. We find that $324,750 of this amount was kicked back to Cortapasso.

The plaintiff claims also that he should recover the entire commission on the theory that there was no need for a buyer's broker in this transaction, a proposition that we accept, and that the Liquidation Bureau would have secured the entire amount of the commission from the landlord absent the involvement of the broker.

According to plaintiff's expert, a sophisticated prospective tenant for such a large block of space, acting in his or her self-interest, would have secured from the landlord all or most of the economic value of the commission from the landlord if no buyer's

---

5. The common law fraud claim requires proof by clear and convincing evidence, *see Simcuski v. Saeli,* 44 N.Y.2d 442, 452, 406 N.Y.S.2d 259, 265, 377 N.E.2d 713, 719 (1978), rather than the preponderance necessary on all other claims, and has a restricted measure of damages in that only out-of-pocket losses are recoverable under New York law, *see Reno v. Bull,* 226 N.Y. 546, 553, 124 N.E. 144 (1919). The claim for commercial bribery raises the issue whether violation of N.Y.Penal L. § 180.05 (McKinney 1988), gives rise to a private cause of action, which the Superintendent has not briefed apart from citing *Shemin v. A. Black & Co.,* 19 A.D.2d 596, 240 N.Y.S.2d 622 (1st Dep't 1963). *Shemin* assumes the point at issue and predates such cases as *CPC Int'l, Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 519 N.Y.S.2d 804, 514 N.E.2d 116 (1987), which cast doubt on its vitality. As there are no elements of damage available on these claims that are not recoverable on the RICO or breach of fiduciary duty claims, we see no need to address them.

broker had been involved. He declined to express a view as to the amount of the value that would have been captured by the Liquidation Bureau, a public agency and therefore perhaps not as knowledgeable and aggressive as a New York real estate professional. Taking these factors into account, we find that the Superintendent would have obtained $450,000 in value from the landlord absent the involvement of the broker.

Under State law, the plaintiff is entitled to recover the $450,000 of which he was deprived as a result of Cortapasso's breach of duty as well as the amount of the bribe received by Cortapasso. *E.g., City of New York v. CitiSource, Inc.,* 679 F.Supp. 393, 398 (S.D.N.Y.1988). Some of the $450,000 of course was kicked back to Cortapasso, and the Superintendent is not entitled to double recovery. In consequence, we conclude that the Superintendent is entitled to recover the entire $450,000 plus so much of the difference between the full amount of the commission and the $450,000 as is allocable to the kickback. As Cortapasso received 46.9% of the total commission, 46.9% of the difference between $692,739 and $450,000, or $113,794, is allocable to the kickback. Accordingly, the Superintendent is entitled to recover $563,-794 on this aspect of his State law claim.

■ The question whether this entire amount is recoverable under RICO as well as under State law is not entirely clear. Certainly the $450,000 is a loss sustained by the Superintendent in consequence of the RICO violations. We have found, however, that the Superintendent would not have realized the benefit of any of the remaining $242,749 of the commission paid to Capolino even if no buyer's broker had been inserted improperly into the transaction. While 46.9% of that amount, or $113,794, is recoverable by the Superintendent on the State law breach of fiduciary duty claim, it is recoverable not as a loss sustained by the Superintendent but in the nature of a disgorgement or unjust enrichment remedy imposed by equity on faithless agents. *Musico v. Champion Credit Corp.,* 764 F.2d 102, 112–15 (2d Cir.1985); *Bon Temps Agency Ltd. v. Greenfield,* 184 A.D.2d 280, 584 N.Y.S.2d 824 (1st Dep't 1992). The issue is whether RICO permits

recovery of such an amount, an issue which goes solely to the question whether the Superintendent is entitled to have that additional amount trebled.

Our starting point is Section 1964(c), the RICO damages provision, which states in pertinent part:

> "Any person injured in his business or property by reason of a violation of section 1962 of this chapter ... shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

Thus, on the face of the statute, the losses that the plaintiff may recover *under RICO* extend only to compensation for injury to business or property sustained by the plaintiff by reason of a RICO violation. Hence, the statute strongly suggests that the plaintiff is entitled to recover under RICO only that part of the commission which the plaintiff would have realized absent the RICO violation, i.e., $450,000. The additional amount allocable to the kickback was not a loss sustained by the plaintiff and therefore is not subject to trebling under RICO, although it is recoverable under State law. This view is supported by antitrust jurisprudence, which is particularly pertinent here in light of the fact that the treble damages provision of RICO was imported wholesale from the antitrust laws. *See, e.g., In re National Mortgage Equity Corp. Mortgage Pool Certificate Securities Litig.,* 636 F.Supp. 1138, 1151–52 (C.D.Cal.1986).

In general, the measure of damages in antitrust cases is the profits lost by the plaintiff in consequence of the defendant's antitrust violation, *see, e.g.,* I ABA ANTITRUST SECTION, ANTITRUST LAW DEVELOPMENTS 670 (3d ed. 1992), rather than, for example, the profits realized by the defendant as a result of its violation.

*Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), is instructive. The plaintiff there claimed that the prices it paid had been inflated by reason of the defendant's monopolization of the relevant market. Our Circuit, however, ruled that the measure of damages was "the price increment caused by

the anticompetitive conduct that originated or augmented the monopolist's control over the market" rather than "the entire excess of the monopolist's price over that which would prevail in the competitive market." *Id.* at 297–98.

The considerations in *Berkey*, to be sure, were different than those at bar. The defendant in that case had acquired monopoly power in significant part through its skill, foresight and industry rather than by illegal activities. Thus, the quasi-disgorgement measure proposed by the plaintiff, if adopted, would have deprived the defendant of the benefit of its lawful as well as its unlawful actions. Nevertheless, the case did limit recovery to the loss to the plaintiff caused by the unlawful actions of the defendant.

For these reasons, we conclude that the plaintiff is entitled to recover $450,000 on this element of the claim under RICO and an additional $113,794 under State law alone, which will not be trebled.

■ *2. Cortapasso's Salary.* The Superintendent seeks to recover $288,442 in respect of the salary paid to Cortapasso during the period of his dishonesty, evidently on the theory that a faithless agent is not entitled to retain any compensation. *See Musico v. Champion Credit Corp.*, 764 F.2d 102, 112–13 (2d Cir.1985); *Interpool Ltd. v. Patterson*, 874 F.Supp. 616, 619–622 (S.D.N.Y.1995). We hold that the Superintendent is entitled to recover the salary paid to Cortapasso during the period April 3, 1984 through his retirement, which we find to have been $193,-132. (*See* PX 39)

■ *3. DePrima's Salary.* The Superintendent claims that Cortapasso's deputy, John DePrima, also was corrupted by Capolino, that he too participated in the scheme with Cortapasso, and that Cortapasso therefore is liable for the compensation paid to DePrima.

There is, to be sure, evidence to support the Superintendent's theory. DePrima had substantial responsibility for the Bureau's activities and, according to Cortapasso, pro-

cured guard services from Capolino companies.[6] While employed by the Bureau, DePrima was listed on the payroll of one of Capolino's companies, Advantage Protection, as working 72 hours per week over a seven week period for Advantage. (PX 255, 256) There is reason to believe this was a "no show" job and, in substance, a payoff. Nonetheless, this occurred in June and July 1987 and thus at about the time that Cortapasso left the Bureau. It postdated all of the actions by DePrima that the Superintendent claims were corrupt. In all the circumstances, we decline to find that Cortapasso was a participant in a breach of fiduciary duty by DePrima. Hence, Cortapasso is not liable for disgorgement of the salary paid to DePrima.

■ *4. Bribe Payments.* The Superintendent seeks to recover $41,302, which he characterizes as bribe payments, without explaining the basis for the amount. The total of the cash deposits to Cortapasso's bank and casino accounts and the cash payments he made on the cars and the boat, however, is $41,202, so we assume this is what the Superintendent has in mind.

There is of course no direct proof that any of these deposits and payments were bribes paid by Capolino. Nevertheless, as noted above, Cortapasso offered no credible explanation for the money. We infer that it is the proceeds of bribes. Moreover, we rely on the principal that a wrongdoer such as Cortapasso may not take advantage of the difficulty in computing damages created by his own wrongdoing. *See, e.g., Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Story Parchment Co. v. Patterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931). Accordingly, plaintiff is entitled to recover $41,-202 on this claim. For the reasons outlined above, this recovery is on the State law claim alone and is not subject to trebling.

■ *5. State Court Attorneys' Fees.* The Liquidation Bureau evidently stopped payments in mid to late 1987 on contracts

---

**6.** As noted below, the Superintendent claims that Cortapasso was at least as responsible for this procurement as DePrima.

and leases with a number of Capolino entities. They in turn sued the Superintendent in six State court actions for goods sold and delivered, services rendered, and breach of warehouse leases (the "Capolino Suits"). (PTO B–70 through 75) The Superintendent claims that it is entitled to recover $593,972 from Cortapasso, the alleged cost of defending the Capolino Suits.

The evidence submitted on this claim consists of two of the State court complaints (PX 152, 153), stipulations as to the fact that these suits were brought and their nature (PTO B–70 through 75), and a summary of the fees and disbursements allegedly incurred in defending the Capolino Suits in the period February 1988 through December 1989. (PX 322).

Cortapasso has not contested either that the fees and disbursements were incurred as claimed or their reasonableness. Accordingly, we find that the Superintendent expended $593,972 defending actions on contracts and leases that, as appears below, were void by reason of the malfeasance of Cortapasso and Capolino. We therefore turn to the question whether Cortapasso is liable for these expenditures.

This is essentially an issue of law: is Cortapasso liable for the cost of defending the Bureau against claims by Capolino, made after Cortapasso's departure, to recover payments on illegally procured contracts? Under New York law, a party may recover attorney's fees from a third party "where the litigation is caused by the wrongful act of [the] third party." *Goldberg v. Mallinckrodt, Inc.*, 792 F.2d 305, 309 (2d Cir.1986); *Chase Manhattan Bank, N.A. v. Traditional Inv. Corp.*, No. 92 Civ. 2774, 1995 WL 72410, at *5, 1995 U.S.Dist. LEXIS 2031, at *14–16 (S.D.N.Y. Feb. 15, 1995); *Shindler v. Lamb*, 25 Misc.2d 810, 812, 211 N.Y.S.2d 762, 765 (Sup.Ct.N.Y.Co.1959), *aff'd without opinion*, 10 A.D.2d 826, 200 N.Y.S.2d 346 (1st Dep't 1960), *aff'd on other grounds*, 9 N.Y.2d 621, 210 N.Y.S.2d 226, 172 N.E.2d 79 (1961). Here, the actions in which the Superintendent was sued arose, at least in part, as a result of Cortapasso's malfeasance. Cortapasso therefore is liable for the $593,972 expended by the Superintendent in defend-

ing those actions. Nor do we see any reason to conclude that these expenses were not injuries to the Superintendent's business or property proximately caused by Cortapasso's RICO violations. *See* 18 U.S.C. § 1964(c). Hence, they are subject to trebling.

*6. Payments to Capolino Entities.* The balance of the Superintendent's damage claims all seek to recover the gross amounts paid to Capolino entities in transactions tainted by the corruption or, alternatively, the difference between the fair market value of whatever the Bureau paid and received. They present a common legal question: whether Cortapasso, assuming liability with respect to a particular contract, is liable only for the out-of-pocket damages to the Bureau or for the gross amount of the payments to the Capolino entities involved.

It long has been established in New York that a vendor who procures a public contract in violation of competitive bidding requirements through corruption, whether of a public official or through collusive bidding, is not entitled to any payment. If the vendor has been paid, the public entity is entitled to recover all sums paid on the contract without regard to the value of the goods or services provided. If the vendor has not been paid, it is not entitled to recover either on the contract or in quasi-contract. The policy underlying the rule is that this harsh forfeiture is essential to deter violation or circumvention of competitive bidding, for permitting the vendor to recover or retain the fair value of what the vendor has provided would leave no effective deterrent. *E.g., S.T. Grand, Inc. v. City of New York*, 32 N.Y.2d 300, 344 N.Y.S.2d 938, 298 N.E.2d 105 (1973); *Gerzof v. Sweeney*, 22 N.Y.2d 297, 292 N.Y.S.2d 640, 239 N.E.2d 521 (1968); *Jered Contracting Corp. v. New York City Transit Authority*, 22 N.Y.2d 187, 292 N.Y.S.2d 98, 239 N.E.2d 197 (1968).

The New York Court of Appeals has carved out one limited exception to this rule of forfeiture. In *Gerzof*, the successful bidder obtained the contract, in preference to a lower bid, by prevailing upon the municipality to revise the specifications after the receipt of initial bids to make it impossible for the low bidder to rebid. As there was no

suggestion that the original bidding had been tainted, the Court held that the appropriate measure of damages was the difference between the amount the village paid the successful bidder and the original low bid. In *S.T. Grand*, however, the Court narrowly confined the *Gerzof* exception, noting that it was born of the fact that both the village's determination that it needed the equipment and the amount of the original low bid were untainted by misconduct. 32 N.Y.2d at 306–07, 344 N.Y.S.2d at 943, 298 N.E.2d at 109.

Here, the Bureau's determinations of need are, for the most part, at least suspect if not plainly tainted. We lack any contemporaneous and objective measure, such as that provided by the untainted bid in *Gerzof*, of the arm's length value of what the Bureau procured although the Superintendent in some instances has offered expert testimony as to that value. Moreover, in at least some instances, the services that Capolino contracted to provide in fact were not provided. Accordingly, the New York rule of complete forfeiture would apply to claims against Capolino and his entities.

■■■ This brings us to the immediate issue—whether a public servant who corruptly participates in circumvention of competitive bidding regulations is liable under New York law for the full amount paid to the vendor or only the difference between the value of what the public entity received and the price it paid. We are aware of no New York authority on the point and therefore must seek to predict how the New York Court of Appeals would decide the question were it presented.

The strict forfeiture principle that New York applies to vendors rests on an assessment of the economic consequences of the alternative rules. If the vendor were liable only for the difference between the fair market value of what it provided and the inflated price made possible by its corruption, the economic incentives would tilt in favor corruption. The vendor would keep a super-competitive profit if the corruption went undetected and make a normal profit if the fraud were detected and the difference disgorged. Putting aside, for the moment, the deterrent effect of criminal sanctions, such a rule of damages would put the vendor in the position of standing to profit from successful corruption while risking no economic loss if the corruption were found out.

The position of the corrupt public servant is not precisely analogous to that of the corrupt vendor. The corrupt public servant is subject to very substantial economic penalties, apart from any criminal sanctions, in the event corruption is discovered. He or she of course is liable for any kickback, bribe or other benefit received. Under the principle described in *Musico*, which is derived from antecedents common to the *S.T. Grand* principle applicable to corrupt vendors, the public servant is liable also for all compensation received from the employer during the period of disloyalty. Moreover, it is the policy of this State to forfeit pensions of civil servants who have committed misconduct in violation of the public trust in order to deter such misconduct. *See, e.g., Winston v. City of New York*, 759 F.2d 242, 249 (2d Cir.1985); *Mahoney v. McGuire*, 107 A.D.2d 363, 366, 487 N.Y.S.2d 13, 16 (1st Dep't), *aff'd*, 66 N.Y.2d 622, 495 N.Y.S.2d 29, 485 N.E.2d 236 (1985). Public servants thus are subject to extremely substantial economic penalties by reason of any breach of their duty of honesty even without subjecting them to liability for the amounts paid to vendors pursuant to contracts tainted by their corruption. They are not, from an economic standpoint, in the "heads I win," "tails I don't lose" posture that corrupt vendors would occupy absent the *S.T. Grand* rule. Hence, the need for the rule advocated by the Superintendent is not clear, in contrast to the situation in *S.T. Grand*. We note also that there is at least some suggestion of a countervailing State policy. Section 51 of the General Municipal Law provides that, in the discretion of the Court, a corrupt municipal employee may be declared "personally responsible . . . so as to indemnify and save harmless" the municipality for any "waste or injury" resulting from the official's misfeasance or nonfeasance. N.Y.Gen.Mun.L. § 51 (McKinney 1986). Thus, the liability of a corrupt official subject

to the statute [7] is capped at the amount necessary to make the public whole.

The result the Superintendent seeks here—holding Cortapasso liable not only for the damage he has done and for the full amount of his compensation for over three years, some of which is subjected to trebling under RICO, but also for the full amounts paid to the Capolino entities without deduction of the value of anything the Liquidation Bureau received—would be extraordinarily Draconian. Given the fact that this result appears unnecessary to provide an ample deterrent, given the General Municipal Law's suggestion that the measure of liability should be the harm inflicted, and given the lack of any State authority supporting the Superintendent's position, we hold that Cortapasso is liable with respect to the Bureau's payments to Capolino entities only for the difference between the value of what the Bureau received and the price the Bureau paid in its transactions with the Capolino entities.

 The Superintendent alleges the following damages based upon the difference between the amounts paid by the Superintendent and the purported fair market value of services: (a) $494,833 for the Brooklyn warehouse lease; (b) $354,376 for the Queens warehouse lease; (c) $101,872 for operating the elevator and opening and closing the Brooklyn warehouse; (d) $135,418 for electrical and shelving work at the Brooklyn warehouse; (e) $264,395 for security guard services; (f) $13,526 for security equipment; (g) $202,847 for trucking services; and (h) $44,621 for cleaning services. We deal with them in turn.

*(a) Brooklyn warehouse lease.* The rent paid by the Superintendent on the Brooklyn warehouse was $910,833. (*See* PX 60, 57, 54) Jerome Haims, a real estate expert, testified that the fair market value for the space was $1.35 per square foot, whereas the Bureau paid $2.50 per square foot. We credit Haims' testimony and therefore find Cortapasso liable for the difference, or $418,983.

*(b) Queens warehouse lease.* Cortapasso is liable for the amount the Bureau overpaid the Capolino entities for the Queens warehouse as well. The Bureau paid $683,438 in rent on the Queens warehouse. (*See* PX 89, 85) Haims testified that the fair market value was $3.65 per square foot versus the $7.66 the Bureau was charged. Cortapasso is liable for the difference, or $357,779.

*(c) Operating the Elevator and Opening and Closing the Brooklyn Warehouse.* The Superintendent submitted invoices for the costs of opening and closing the Brooklyn warehouse, operating the elevator, answering telephones and accepting deliveries. The total amount the Superintendent paid Capolino entities for these services was $101,872. (*See* PX 66) There is testimony from which we conclude that no one other than employees of the Liquidation Bureau performed these services and therefore that the invoices charging the Bureau for the cost of outside workers were shams. For example, David Jackman, the Supervisor of the Brooklyn warehouse at the relevant times, testified that the warehouse was opened and closed only by employees of the Bureau (PX 412 at 14) and that only Bureau employees accepted deliveries on behalf of the Bureau. (*Id.* at 16) We find Cortapasso liable for the $101,972, the full amount of these services.

*(d) Electrical and Shelving Work at Brooklyn Warehouse.* Plaintiff submits invoices for electrical and shelving work at the Brooklyn warehouse totalling $271,337. (*See* PX 75, 104) Plaintiff has submitted no evidence of the fair market value of this work but urges the Court to find, based on the 100% mark-up above the fair market value on the Brooklyn and Queens warehouse leases, that the amount charged for electrical and shelving work includes a 100% mark-up. We decline to do so. We do not regard the mark-up on the warehouse space as indicative in any way of the value of the electrical and shelving work. We have no persuasive basis for concluding that the Superintendent overpaid by any particular amount. Accord-

---

7. We recognize that this statute does not apply to Cortapasso, who was not employed by any of the sorts of political entities referred to in the statute.

ingly, we find no damages with respect to this item.

(e) *Security Guards.* The Superintendent alleges $264,394 in damages. The Superintendent paid $652,347 for security guards with respect to security guard services provided to the Bureau by Capolino entities. The Superintendent argues that Cortapasso is liable for $5,760, the full amount paid to Janeen Schroeder, a Bureau employee, and John DePrima, whom she later married, for their work as security guards at the Brooklyn warehouse, and that he is liable for 40% of the difference between $652,347 and $5,670.

There is reason to believe that the jobs held by Schroeder and DePrima were "no show" jobs. Nevertheless, the payments to Schroeder and DePrima were made after Cortapasso left the Bureau and we therefore decline to find Cortapasso liable for the $5,760 billed to the Bureau for Schroeder and DePrima.

Advantage Security charged the Bureau $15.00 per hour for security guards. (PX 236) The Bureau ultimately replaced Advantage Security with Pinkerton which charged the Bureau $9.61 per hour, which we find to reflect the fair market rate. Accordingly, we find that Advantage overcharged the Bureau by 36%. Cortapasso therefore is liable for $234,845 with respect to security guard services.

(f) *Security Equipment.* The Superintendent claims that Cortapasso is liable for $13,526 in damages with regard to security equipment. There is evidence that the Bureau made payments totalling $184,205 to Advantage Security and Advantage Protection for security equipment. (PX 112) However, the Superintendent indicates in his submissions to the Court that the Bureau paid only $152,526 for BASIX security equipment. The fair market value of the BASIX system, according to testimony by David Aggleton, a security systems expert whom we credit, was $139,000. Cortapasso therefore is liable for at least $13,526, the difference between the Bureau's payment for the system and its fair market value. Since the Superintendent has limited his claim to $13,526, we find Cortapasso liable only for this amount.

(g) *Trucking.* The Superintendent alleges $202,847 in damages with regard to payments made by the Bureau to T.N. Capolino Trucking, a Capolino entity, for trucking services. The Superintendent asserts that $48,160 of the trucking work associated with the Queens warehouse was unnecessary. Furthermore, the Superintendent would have the Court assume, from the mark-ups on the warehouse leases, that the trucking invoices also included a 100% mark-up. We do not find that plaintiff has proved that any of the trucking work performed was unnecessary. Nor do we find persuasive the Superintendent's argument that we should assume that the cost of the services was marked-up 100%. The Superintendent submitted no persuasive evidence of what work was done or what it was worth. We conclude that he has not met his burden with respect to damages for trucking services.

(h) *Cleaning services.* The Superintendent has submitted invoices totalling $89,242 for amounts paid by the Bureau to Capolino entities for cleaning services. (*See* PX 25, 30, 32, 20, 31) Again, the Superintendent would have the Court assume that the total amount paid by the Bureau for cleaning services includes a 100% mark-up on the fair market value. The Bureau therefore urges the Court to award $44,621 in damages for cleaning services. We decline to do so. Again, we are not persuaded by the Superintendent's argument and find that he has failed to meet his burden.

In sum, Cortapasso is liable to plaintiff for $1,127,105, with respect to payments to Capolino entities in connection with corrupt transactions.

*Summary of Damages*

With regard to the 123 Williams Street commission, plaintiff is entitled to recover $450,000 under the RICO which is trebled for a total of $1,350,000. Furthermore, plaintiff is entitled to recover $113,794 under State law with regard to the Williams Street commission, which is not trebled.

Plaintiff is entitled to recover the salary paid to Cortapasso during the period April 3,

1984 through his retirement, September 18, 1987, which we find to have been $193,132.

Plaintiff is entitled to recover the $41,202 in bribe payments made by Capolino to Cortapasso. As noted above, this amount will not be trebled.

Plaintiff is entitled to recover $593,972, before trebling, for the costs incurred in defending the Bureau against claims by Capolino in prior state court suits.

Finally, plaintiff is entitled to recover $1,127,105 for the out-of-pocket damages suffered as a result of the Bureau's transactions with the Capolino entities.

In sum, the Superintendent is entitled to recover $2,364,209, trebled, and an additional $154,996 which is not subject to trebling. The Clerk therefore will enter judgment in favor of plaintiff and against Cortapasso in the total amount of $7,247,623. As this concludes all proceedings relating to Cortapasso, we hold that there is no just cause for delay and direct the entry of final judgment pursuant to Rule 54(b).

SO ORDERED.