**MTB BANK, Plaintiff,**

v.

**FEDERAL ARMORED EXPRESS, INC., Defendant.**

**FEDERAL ARMORED EXPRESS, INC., Third–Party Plaintiff,**

v.

**MGH ENTERPRISES, a Texas general partnership, and Moses Goldberg, individually, and d/b/a MGH Enterprises, and d/b/a House of Money, Third–Party Defendant.**

No. 93 Civ. 5594 (LBS).

United States District Court, S.D. New York.

Jan. 6, 1997.

Winston & Strawn, New York City (Joseph DiBenedetto, Steven B. Rissman, of counsel), for Plaintiff.

Clausen Miller, P.C., New York City (Andrew C. Jacobson, Deborah L. Sheward, of counsel), for Defendant.

SAND, District Judge.

This action arises from the misdelivery of two shipments of gold by defendant Federal Armored Express ("Federal") in May, 1993. On August 6, 1996, this Court granted summary judgment for plaintiff MTB Bank

("MTB") on the issue of Federal's liability. *See MTB Bank v. Federal Armored Express,* No. 93 Civ. 5594 (LBS), 1996 WL 445358 (S.D.N.Y. Aug. 6, 1996). Now before the Court is MTB's motion for summary judgment as to damages. For the foregoing reasons, MTB's motion is granted in part and denied in part.

## I.

## BACKGROUND

MTB is a commercial bank which engages in the sale of precious metals. Beginning in 1982, MTB engaged in sales of gold bullion and coins to MGH Enterprises ("MGH"), a firm located in Laredo, Texas. At issue in this action are two orders for gold placed by MGH in May, 1993: the first order was placed on May 14, 1993 (the "May 14 shipment"), with a contract price of $949,997.50, and the second was placed on May 18, 1993 (the "May 18 shipment"), with a price of $929,378. The total price for the two shipments was $1,879,375.50.

MTB and MGH agreed that the gold would be shipped to MGH's bank, the Laredo branch of the International Bank of Commerce ("IBC"). IBC was to hold the gold until MGH had paid the purchase price to MTB. However, Federal, which shipped the gold, released the gold directly to MGH's agents rather than delivering the gold to IBC. MGH never paid the full purchase price for the shipments.

In June, 1993, MTB commenced an action in Texas state court against MGH and its general partner, Moses Goldberg, seeking to recover the payments for the two shipments. That action was settled. Goldberg filed for bankruptcy shortly thereafter.

In August, 1993, MTB commenced an action in this Court against Federal, alleging that Federal had misdelivered the gold by transporting it to MGH's agents rather than to IBC. This Court granted summary judgment to MTB on the issue of Federal's liability, and ordered that the damages to be paid by Federal be offset by any amounts paid to MTB by MGH for the May 14 and May 18 shipments. *See MTB Bank,* 1996 WL 445358 at *4–*10.

Now before the Court is MTB's motion for summary judgment as to damages. The central question is the extent to which various payments made by MGH to MTB should be allocated to the May 14 and May 18 shipments, and therefore offset against the damages to be paid by Federal. MTB contends that the Texas settlement is determinative of this issue, because it represents a valid agreement between a debtor and a creditor as to the allocation of payments. Federal contends that the issue is one which requires a trial. MTB also seeks to recover attorney's fees expended in pursuing the Texas action and in asserting claims in Goldberg's bankruptcy proceedings.

For the reasons set forth below, we agree with MTB that the Texas settlement is determinative as to the extent to which payments made by MGH to MTB should be allocated to the May 14 and May 18 shipments, and hence the settlement dictates the amount by which the damages owed by Federal are to be offset. However, we deny MTB's request for summary judgment as to attorney's fees.

## II.

## DISCUSSION

The Texas settlement set MGH's remaining liability to MTB for the May 14 and May 18 shipments at $1,440,762.30,[1] plus attor-

---

1. Prior to the Texas action, MGH made various payments to MTB. *See* Tersigni Aff. Dated Oct. 7, 1996 ¶ 8. According to MTB, $400,000 of these payments was allocated toward the May 14 and May 18 shipments, and the remainder was allocated to reduce MGH's general account debt to MTB, with older debts paid off first. *Id.* ¶ 9. Thus, according to MTB, at the time of the Texas action, the $1,879,375.50 contract price for the May 14 and May 18 shipments had been reduced to $1,479,375.50. *Id.* ¶¶ 9–10. MTB accordingly

sued in the Texas action for $1,479,375.50. *Id.* ¶ 10.

The Texas action was actually settled for slightly less, at $1,440,762.30. *Id.* ¶ 11. This is so because, due to "adjustment," only $348,108.68 was allocated to the May 14 and May 18 shipments, rather than $400,000; furthermore, MGH was given credit for $90,404.53 which MTB had attached in the Texas suit. *Id.* n. 4. In addition, the Texas settlement contained a $100 calculation error. *Id.* Thus, the final amount of the

ney's fees and prejudgment interest. *See* DiBenedetto Aff. Dated Oct. 7, 1996 Ex. H. MTB therefore contends that Federal's liability to MTB should equal $1,440,762.30. MTB seeks this amount, minus $18,448.26 recovered by MTB in Goldberg's bankruptcy distribution, plus attorney's fees in the amount of $109,869.28 [2] sustained by MTB during the Texas action and the bankruptcy proceedings. Thus, MTB seeks summary judgment in the total amount of $1,532,-183.32. *See* DiBenedetto Reply Aff. Dated Nov. 14, 1996 ¶ 6.

We will proceed by first addressing whether the Texas settlement is dispositive as to the amount remaining due from MGH to MTB on the May 14 and May 18 shipments. We will then proceed to discuss the attorney's fees.

## A. *The Texas Settlement*

MTB contends that, under the law governing payments from debtors to creditors, the Texas settlement is dispositive as to the amount remaining due from MGH to MTB for the May 14 and May 18 shipments. By contrast, Federal contends that there is a question of fact as to the extent to which payments made by MGH to MTB should be allocated to the May 14 and May 18 shipments, as opposed to the general account between MTB and MGH. Federal contends that the Texas settlement is therefore not binding in the instant action.

 Under the well-settled law of payments, when a debtor owes multiple obligations to a creditor, and the debtor makes a payment, the debtor has the initial right to specify which obligation he wishes the payment to be applied to. *Bank of California v. Webb*, 94 N.Y. 467, 472 (1884); *Beyer Bros. of Long Island Corp. v. Kowalevich*, 89 A.D.2d 1005, 454 N.Y.S.2d 444, 445 (1982); *Smith v. Rothman*, 6 A.D.2d 859, 175 N.Y.S.2d 956, 957 (1958), *aff'd*, 6 N.Y.2d 793, 188 N.Y.S.2d 187, 159 N.E.2d 679 (1959).[3] In the absence

of such a designation by the debtor, the creditor may specify which obligation to allocate the payment to. *Bank of California*, 94 N.Y. at 472; *Beyer Bros.*, 454 N.Y.S.2d at 445. If neither debtor nor creditor makes an allocation, then the court will do so as equity and justice require. *Bank of California*, 94 N.Y. at 472; *Beyer Bros.*, 454 N.Y.S.2d at 445. In addition, the debtor and the creditor are free to agree to a particular allocation at the time of payment or later, and to agree to re-allocate payments after a particular allocation has initially been made. *See In re Stacy, Wolf Hat Co.*, 99 F.2d 793, 794–95 (2d Cir.1938) (holding that creditor had the right to revoke a particular application of funds and re-apply them); *Wolf v. Aero Factors Corp.*, 126 F.Supp. 872, 880–81 (S.D.N.Y. 1954) (holding that creditor had the right to re-allocate payments), *aff'd*, 221 F.2d 291 (2d Cir.1955); *Foss v. Riordan*, 84 N.Y.S.2d 224, 234 (Sup.Ct.1947) (stating that "where the parties evidence an intention of making an application of payments to a particular account, such intention is binding as between the parties and will not be upset by the court."), *aff'd*, 273 A.D. 982, 79 N.Y.S.2d 515 (1948); *see also* 82 N.Y.Jur.2d *Payment And Tender* §§ 70–86 (1989). The right of the debtor and creditor to make a particular allocation is not affected by third parties who may have an interest in the allocation of payments, such as sureties and guarantors—such third parties generally have no standing to insist on any particular allocation. *See Walther v. Bank of New York*, 772 F.Supp. 754, 762 (S.D.N.Y.1991) (stating that a creditor may apply a debtor's payments to unguaranteed debts, despite guarantor's objection); *Long Island Trust Co. v. Vendall, Inc.*, 35 Misc.2d 464, 231 N.Y.S.2d 131, 133 (Sup. Ct.1962) (stating that "the mere fact that there is a surety for one of the debts does not preclude the creditor from applying a payment to the debt for which he has no

---

Texas settlement was $1,440,762.30. *See* DiBenedetto Aff. Dated Oct. 7, 1996 Ex. H.

**2.** MTB initially sought attorney's fees in the amount of $126,384.38. However, MTB has reduced that amount to $109,869.28. *See* DiBenedetto Reply Aff. Dated Nov. 14, 1996 ¶¶ 5–6.

**3.** The parties have briefed and argued this case under New York law. Hence, we will apply New York law. We note, though, that the traditional law of payments is well-accepted in American jurisdictions. *See* 60 Am.Jur.2d *Payment* §§ 94–110 (1987).

security or less security."); *see also* 82 N.Y.Jur.2d *Payment And Tender* §§ 83, 85.

■ Under these traditional principles, it is clear that MTB and MGH had the right to agree as to the allocation of payments made by MGH to MTB. The Texas settlement reflects their agreement that the amount remaining due on the May 14 and May 18 shipments, after allocation of MGH's payments, equalled $1,440,762.30.[4] Federal, as a third party, has no standing to object to this allocation.

Federal has not cited any contrary authorities regarding the law of payments. Federal's brief consists mainly of arguments that various payments made by MGH were originally intended to apply to the May 14 and May 18 shipments. However, as the law of payments makes clear, it is the right of the creditor and the debtor to reach an agreement which changes the allocation of past payments. *See* 82 N.Y.Jur.2d *Payment And Tender* § 73. Thus, the Texas settlement agreement overrides any prior expressions of intent by MGH or MTB.

■ It is true that the Texas agreement was reached after the parties had entered into litigation in Texas state court. However, this does not invalidate the agreement. Under New York law, the right of the debtor and creditor to specify an allocation does not cease when litigation is commenced; rather, an allocation may be made at any time until a court has ordered one. *See Bank of California*, 94 N.Y. at 472 (stating that *"there can be no limit of time* within which he [the creditor] must make the application ... hence the creditor ... could at any time make the application before it was made under the direction of the court," and holding that an allocation made more than one year after suit had commenced was effective) (emphasis added); *Sheppard v. Steele*, 43 N.Y. 52, 60

(1870) (stating that a creditor may make an application *"at any time* afterward [after receipt of the payment] as he chooses, if it is a matter of indifference to the debtor where it [the payment] is applied.") (emphasis added); *Wanamaker v. Powers*, 102 A.D. 485, 93 N.Y.S. 19, 22 (1905) (quoting *Bank of California, supra*), *aff'd*, 186 N.Y. 562, 79 N.E. 1118 (1906). Thus, courts applying New York law have recognized that the right of a creditor to specify an allocation continues to exist while litigation concerning the matter is pending. *See, e.g., Walther*, 772 F.Supp. at 761–62 (recognizing a creditor's continuing right to specify allocation of payments, despite the fact that an action had been filed by a guarantor for declaratory judgment as to allocation of payments). Most analogous to the case at hand, the New York Court of Appeals has held that, where an agreement as to allocation of payments was reached between a debtor and representatives of the creditor in a prior surrogate's court proceeding, that agreement was binding on third parties in a subsequent action. *See Grant v. Keator*, 117 N.Y. 369, 375–77, 22 N.E. 1055 (1889). The *Grant* court stated:

> There was nothing to prevent the parties to this indebtedness, at the date of the surrogate's decree, from making such application thereof as they might agree upon, and having, under the sanction of the surrogate's court, applied it upon the unsecured indebtedness of the debtor, strangers to the transaction have no right to complain. The appellants [the third parties] were not parties to that accounting, and had no legal right to appear therein, or litigate the question of the application of such account; and the disposition then made of it is conclusive upon them.

*Id.* at 377, 22 N.E. 1055.[5]

Accordingly, we conclude that the Texas settlement agreement is dispositive as to the

---

4. Federal argues that the Texas settlement agreement does not specifically state that it reflects the agreement of MTB and MGH as to allocation of payments. However, as is evident from the papers filed in the Texas action, MTB was suing for the amounts due on the May 14 and May 18 shipments. *See* DiBenedetto Aff. Dated Oct. 7, 1996 Ex. G. The settlement agreement was thus an expression of understanding that the amount

remaining due on the May 14 and May 18 shipments was $1,440,762.30.

5. We recognize that some New York case law indicates that an allocation made after a lawsuit has commenced is ineffective. *See, e.g., Sanford v. Van Arsdall*, 6 N.Y.S. 494, 497–98 (1889) (concluding that application made after suit commenced was too late); *Foss*, 84 N.Y.S.2d at 233 (stating that "[i]t is certainly too late for either

amount remaining due from MGH to MTB for the May 14 and May 18 shipments.[6] We therefore grant summary judgment to. MTB in the amount of $1,440,762.30 (the amount of the Texas settlement), less the $18,448.26 gained by MTB in Goldberg's bankruptcy proceeding. Hence, we grant summary judgment to MTB in the amount of $1,422,-314.04.

### B. Attorney's Fees

MTB seeks to recover from Federal as damages the amount of the attorney's fees which MTB incurred in pursuing the Texas action against MTB and in asserting claims in Goldberg's bankruptcy.

 The general rule is that attorney's fees are not available as an item of damages, absent express statutory or contractual authority. *Aero Garage Corp. v. Hirschfeld,* 185 A.D.2d 775, 586 N.Y.S.2d 611, 612 (1992). However, there is a well-recognized exception which holds that "[i]f, through the wrongful act of his present adversary, a person is involved in earlier litigation with a third person in bringing or defending an action to protect his interests, he is entitled to recover the reasonable value of attorneys' fees and other expenses thereby suffered or incurred." *Shindler v. Lamb,* 25 Misc.2d 810, 211 N.Y.S.2d 762, 765 (Sup.Ct.1959), *aff'd,* 9 N.Y.2d 621, 210 N.Y.S.2d 226, 172 N.E.2d 79 (1961); *see also Curiale v. Capolino,* 883 F.Supp. 941, 951 (S.D.N.Y.1995) (stating that a party may recover attorney's fees from a third party "where the litigation is caused by the wrongful act of [the] third party) (citation omitted); *Aero Garage Corp.,*

586 N.Y.S.2d at 612–13. MTB's involvement in the Texas action and. the Goldberg bankruptcy were necessitated by Federal's wrongful misdelivery of the two gold shipments. Accordingly, MTB has the right to recover from Federal the reasonable attorney's fees which it incurred in the Texas action and the Goldberg bankruptcy.

 However, though MTB's entitlement to these fees is clear, we believe that there is a genuine issue of fact as to the reasonable amount of fees incurred by MTB in these prior proceedings. Accordingly, we deny summary judgment as to attorney's fees. Resolution of this matter will require an evidentiary hearing.

### III.

### CONCLUSION

For the reasons set forth above, we grant summary judgment to plaintiff MTB in the amount of $1,422,314.04, which represents the amount of damages to be paid by Federal following offset of amounts paid by MGH to MTB. We deny MTB's motion for summary judgment as to attorney's fees, and will schedule a conference with counsel for the purpose of scheduling further proceedings to resolve this remaining issue.

SO ORDERED.

party to claim a right to make an appropriation, after the controversy has arisen, and a fortiori at the time of trial.") (citation omitted); *Dairymen's League Coop. Ass'n v. Hartford Accident & Indem. Co.,* 252 A.D. 527, 300 N.Y.S. 431, 436 (Sup.Ct. 1936) (stating that allocation must be made within a "reasonable time" after payment is made), *aff'd,* 252 A.D. 527, 300 N.Y.S. 436 (App.Div. 1937); *In re Philippe's Estate,* 31 Misc.2d 193, 220 N.Y.S.2d 924, 935 (Surr.Ct.1961) (citing *Foss, supra*), *aff'd,* 14 N.Y.2d 600, 248 N.Y.S.2d 886, 198 N.E.2d 263 (1964). However, this case law is not controlling. With the exception of *Sanford,* all of these cases discuss the issue in dictum; furthermore, none cite or discuss *Bank of California, Grant,* or any other New York case which indicates that an application made after

suit has commenced. is effective. Accordingly, the greater weight of authority indicates that debtor and creditor continue to have the power to agree as to an allocation even after a lawsuit has commenced. *See F.H. McGraw & Co. v. Milcor Steel Co.,* 149 F.2d 301, 305 (2d Cir.1945) (noting that weight of New York authority does not require application to be made before suit has commenced).

**6.** MTB also argues that the Texas settlement is binding under principles of res judicata, because it was reduced to a final judgment in the Texas court. Our holding under the law of payments eliminates the need to address this question.